**Neil HUNTERSON, Petitioner,**

v.

**Mary Keating DiSABATO, Chairperson, New Jersey State Parole Board, et al., Respondents.**

**No. CIV.A. 98–482.**

United States District Court, D. New Jersey.

March 16, 2001.

---

**6.** *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

John S. Furlong, Furlong & Krasny, West Trenton, NJ, for Petitioner.

John J. Farmer, Jr., Attorney General of New Jersey by Daniel F. Dryzga, Jr., and James D. Harris, Deputy Attorneys General, Trenton, NJ, for Respondents.

## OPINION

RODRIGUEZ, District Judge.

Two and one-half years ago, this Court ordered petitioner's immediate release from prison upon finding that the New Jersey State Parole Board violated petitioner's substantive due process rights by imposing a future eligibility term far in excess of the norm imposed for petitioner's actual parole violation, and that the Board's action was arbitrary, capricious, and an abuse of discretion, and, in addition, that the New Jersey Superior Court, Appellate Division's affirmance of the Board's decision was unreasonable.

Rather than comply with this Court's Order, however, respondents waited four

days and then filed a motion for a stay of the Order granting habeas corpus relief along with a motion for reconsideration accompanied by a confidential psychological evaluation. The Court granted in part respondents' motion for reconsideration in light of the Third Circuit's holding in *Gambino v. Morris*, 134 F.3d 156 (3d Cir. 1998), which instructs that absent unusual circumstances, a remand to the Parole Board, or something other than immediate parole release, is the appropriate remedy to be afforded a petitioner who succeeds in obtaining a writ of habeas ·corpus. Since that time, this Court has noted repeatedly that its reconsideration of the earlier Order would be limited to determining only the appropriate remedy to be applied in this case, and that it would not revisit its grant of habeas corpus relief. This matter is now before the Court as a result of simultaneous briefing by the parties on the limited issue of the appropriate remedy to be afforded petitioner.

## I. BACKGROUND

A. *The Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254*

On September 10, 1998, this Court granted petitioner Neil Hunterson's petition for a writ of habeas corpus filed on February 6, 1998 pursuant to 28 U.S.C. § 2254, and ordered his immediate release. The September 10, 1998 Order painstakingly laid out the procedural history of petitioner's parole revocation which led to his filing the instant petition, including:

- petitioner's September 29, 1994 arrest for possession and possession with intent to distribute 50 grams of marijuana, for which he was released on his own recognizance;

- his immediate subsequent (October 3, 1994) arrest on a parole violator warrant based on allegedly positive drug tests, which warrant on its own was found to be without probable cause by the New Jersey Superior Court, Appellate Division on November 2, 1994 [1] due to chain of custody problems (although the New Jersey Parole Board had found that probable cause for the warrant existed at a October 21, 1994 hearing);

- a supplemental notice of probable cause hearing, issued October 27, 1994, based on both the marijuana arrest and the drug tests;

- a third notice of probable cause hearing issued on November 4, 1994, again referencing the marijuana charge;

- the Appellate Division's decision of December 22, 1994 to vacate summarily the second parole violator warrant;

- the Appellate Division's June 20, 1995 decision to vacate the third warrant for lack of probable cause, although the Parole Board had found probable cause at a June 15, 1995 probable cause hearing;

- the New Jersey Supreme Court's grant of a stay of the June 20, 1995 order releasing petitioner and allowing the Chief of the Bureau of Parole to apply to the Parole Board for accelerated parole revocation proceedings;

- a July 6, 1995 probable cause hearing which culminated in a July 10, 1995 decision by the hearing officer that, although probable cause existed to believe petitioner violated his parole, his parole should be continued pending final determination by the paroling authority, and the Parole Board's decision to overrule this determination of the hearing officer and keep petitioner in-

---

1. The respondents were represented by former Attorney General, now New Jersey Supreme Court Justice, Deborah T. Poritz by Michael Carlin, then-Deputy Attorney General, now Executive Director of the Parole Board.

carcerated pending the Board's review of the case;

- the Appellate Division's July 24, 1995 decision that petitioner was to be released because, as he had yet not been convicted of the marijuana charge, (1) the offense with which he was charged was not serious and (2) the record did not support that he was a danger to the public safety;

- the New Jersey Supreme Court's unexplained July 25, 1995 reversal of the Appellate Division's decision;

- several pages of summaries of the testimony offered at the September 29, 1995 final parole revocation hearing, at which petitioner was represented by privately retained counsel and the Bureau of Parole was represented by Mario Paparozzi, Esq.;

- the October 30, 1995 hearing summary submitted to the Adult Panel of the Parole Board which resulted in a two-member board revoking petitioner's parole on November 1, 1995 and referring his case to a three-member panel to impose a future eligibility term outside the guidelines;

- the imposition of a five-year FET by a three-member panel on January 24, 1996;

- the April 3, 1996 denial by the Parole Board of petitioner's administrative appeal;

- the Appellate Division's remand for the Board to reconsider the denial in light of the fact that the Board was not aware that the March 3, 1996 guilty plea to possession of marijuana was downgraded from a fourth degree offense to a disorderly persons offense;

- the April 10, 1996 decision by a three-member panel of the Board to sustain the FET, the August 5, 1996 final administrative decision of the full Board to deny all relief, the September 5, 1997 decision of the Appellate Division to deny petitioner's appeal of the final administrative decision, and the January 15, 1998 denial of certification by the New Jersey Supreme Court.

The Court noted that the respondents originally submitted a two and one-half page Answer to the petition on March 4, 1998, contending that the petition should be dismissed for petitioner's failure to exhaust his administrative remedies. After petitioner filed a traverse refuting their argument, on March 28, 1998, respondents sent a two-page letter reasserting their exhaustion argument and stating that petitioner was scheduled to be given a parole release hearing in May of 1998 and that it was respondents' belief, in any event, that petitioner failed to present "true federal claims."

On April 29, 1998, petitioner filed a motion to compel discovery which included a request for production of documents he alleged were necessary to fully develop the facts of his claim. The respondents did not respond.

On July 6, 1998, this Court issued an Order which found that the exhaustion argument was moot, and directed respondents to file an Answer to the Petition in conformance with the habeas corpus rules, because they had never addressed the merits of petitioner's claims. On July 14, 1998, the Court received an Answer that stated that the Appellate Division found petitioner's claims to be without merit on September 5, 1997, and that under the strict standard of review, that determination did not rise to the level of unreasonableness and, therefore, could not support the granting of a writ of habeas corpus.

On May 21, 1998, approximately three and one-half months after the petition was filed, petitioner received a hearing before a panel of the Board and was denied parole. A thirty-six month FET was imposed. The following day, however, that

decision was vacated and petitioner received another hearing before a different panel of the Board on May 27, 1998. This panel also denied parole but did not impose an FET at that time. On August 24, 1998, Douglass Chiesa, the Deputy Executive Director of the New Jersey Bureau of Parole, confirmed with chambers that no further action had been taken. This was noted on pages 19–20 of the September 10, 1998 Order.

On September 10, 1998, this Court determined that the Parole Board, in revoking petitioner's parole and imposing a future eligibility term outside the guidelines,[2] acted impermissibly and in violation of petitioner's substantive due process rights. The Court found that although the Appellate Division's affirmance of the Board's initial decision on November 1, 1995 to revoke petitioner's parole was satisfactorily supported by the record and therefore not inappropriate, the affirmance of the Board's March 13, 1996 imposition of a longer FET than normally required by statute was unreasonable under the circumstances.

### B. *Respondents' Motion for a Stay*

On September 15, 1998, after considering the September 14, 1998 submissions of the respondents which included documents submitted for *in camera* review, the Court stayed the execution of the September 10, 1998 Order. Respondents' submission included a Notice of Decision suspiciously dated September 9, 1998 which was supposed to have been based on the May 27, 1998 hearing. The Notice of Decision relied on a March 11, 1998 confidential psychological evaluation[3] to deny parole and refer petitioner's case to a three-member panel for establishment of an FET.[4]

### C. *Respondents' Motion for Reconsideration*

On June 10, 1999, this Court granted respondents' motion for reconsideration of the September 10, 1998 Order in light of Third Circuit authority which indicates that the proper remedy in a case such as this one ordinarily would be something other than petitioner's release. Specifically, the Order reads, "the Court will grant the Motion for Reconsideration, and will reconsider its decision in order to formulate a proper remedy to afford petitioner habeas relief." (June 10, 1999 Order, p. 1.)

The Court stated that it would not consider the psychological report submitted under seal (or an allegedly-perjurious affidavit of former Chairman Andrew Consovoy) in making a decision on the reconsideration motion, because it was not "newly discovered" and

> an exercise of due diligence would have put these documents before the Court at the time of its original decision in Sep-

---

2. Specifically, the Court found that the upgraded FET of five years represented an arbitrary and capricious decision, an abuse of discretion, and a violation of petitioner's substantive due process rights and that, at most, petitioner should have received a fifteen month FET under N.J. Admin. Code § 10A:71–7.16.

3. The Board concluded, from the evaluation, that petitioner was "as much of a risk to commit a new crime if released on parole today as [he was] when [he committed the original offense]."

4. On October 21, 1998, a three-member panel hearing was convened before Rachel Chowaniec, Rolando Gomez–Rivera, and Ruby Washington, with petitioner present via video conferencing. This culminated in petitioner again being denied parole and in the panel setting an eight-year FET, on top of the "five-year hit" that this Court had adjudged illegal, through a Notice of Decision dated November 30, 1998.

tember of 1998. The Court found in its earlier decision that the Board's determination was arbitrary and irrational and that the Board failed to explain adequately its decision and the reasoning therefor. The new Affidavit and attached psychological evaluation appear to be a classic attempt at a "second bite at the apple" and, as such, will not be considered.

However, because the respondents rightly contend that the Court overlooked controlling decisions of law which hold that the proper remedy in a situation such as this one would have been something other than ordering petitioner's release, see, e.g., *Gambino v. Morris*, 134 F.3d 156 (3d Cir.1998), the Court will grant the instant motion and will reconsider its September 10, 1998 decision.

The problem now before the Court is fashioning the proper remedy to be applied. The respondents suggest that the proper remedy at the time of the original decision would have been to remand the case to the Parole Board with directions to set a new FET or to hold a new hearing immediately. Petitioner suggests that the appropriate remedy is reinstatement to parole status. However, since the September 10, 1998 Order of this Court was entered, petitioner received a new parole hearing and parole was denied. Further, the Court is mindful of the petitioner's belief that this case presents a political situation in which official misconduct and retaliation may occur at any time.

Because of the inference of unconstitutional retaliation and in order to assist petitioner in rebutting the psychological evaluation presented by the respondents, this Court appointed counsel to petitioner. Presently, petitioner and his attorney are working to secure an independent psychological evaluation and to discover other materials which could have relevance to the Board's latest decision.

\* \* \* \* \* \*

In sum, it is this Court's intention to allow this case to proceed under its jurisdiction, perhaps to a hearing, to develop a complete record. Once discovery has been completed, the Court will reconsider its September 10, 1998 Order, as discussed both above and at the May 13, 1999 status conference. Thus, respondents' Motion for Reconsideration will be granted and the case will proceed under the jurisdiction of this Court.

(June 10, 1999 Order, p. 5–6.)

In that same Order, the Court denied petitioner's motion to vacate the stay, "as discussed during a status conference in this matter, because of the sensitive nature of the 'danger to the public' aspect raised by the confidential psychological evaluation in this case," (June 10, 1999 Order, p. 6) and the Board's interpretation of that evaluation.

D. *Discovery*

On August 5, 1999, petitioner's motion to compel discovery was granted. The Order stated, "this Court has already found that the Board has made arbitrary and capricious decisions with regard to the petitioner, and that in doing so, the Board has abused its power and violated petitioner's substantive due process rights." (August 5, 1999 Order, p. 5.) The Order continued:

Petitioner has not just thrown out unsupported allegations of unconstitutional retaliation, he is forming a record of conspiracy and manufactured evidence. In order for petitioner to defend his position, the Court finds that allowing him a certain latitude in discovery is proper in this case.

Petitioner's discovery requests are very specific and the Court finds that all of the information requested appears to be relevant to the underlying habeas

petition and respondents' motion for reconsideration. Moreover, obtaining such discovery from the respondents is the only avenue petitioner has to test the validity of his claim that he was not afforded a fair parole hearing in compliance with his due process rights.

On August 16, 1999, the Court allowed petitioner's counsel to obtain an independent psychological evaluation of the petitioner; on September 21, 1999, Dr. Gerald Cooke conducted the evaluation and submitted a report. The evaluation was a positive one.

### E.  *Respondents' Motion to Dismiss the Petition*

On February 18, 2000, respondents filed a motion to dismiss the petition, which the Court found to be actually, and finally, in the nature of an Answer. The response argued that the Parole Board's decision to revoke petitioner's parole and impose a sixty-month FET and the Appellate Division's affirmance of that decision were supported by the record and that there was no evidence of selective prosecution against the petitioner. In response, on May 3, 2000, this Court entered an Order clarifying that (1) counsel was appointed to represent the petitioner and discovery granted because of the unique circumstances, including the inference of unconstitutional retaliation, and (2) reconsideration was granted only to determine the appropriate remedy to be applied in the case; the Court would not reconsider either the issue of whether the Board's imposition of a five-year FET was arbitrary, capricious, and an abuse of discretion which violated petitioner's due process rights or the issue of whether the Appellate Division's affirmance of the Board's decision was reasonable.

### II. *DISCUSSION*

As discussed previously, the Third Circuit has instructed in *Gambino v. Mor-*ris, 134 F.3d 156 (3d Cir.1998), that absent unusual circumstances, a remand to the Parole Board, or something other than immediate parole release, is the appropriate remedy to be afforded a petitioner who succeeds in obtaining a writ of habeas corpus. Discovery was granted in this case to allow petitioner an opportunity to support his claim of unique circumstances and demonstrate that the ordinary remedy of a remand to the Parole Board clearly would be inadequate and inappropriate. Proof of a politically-motivated conspiracy against the petitioner within the Parole Board, as alleged, obviously would argue against remand. Also of importance is a consideration of the constitutional infirmities alleged during the parole panel hearings subsequent to the filing of the instant petition for habeas corpus relief and after this Court's 1998 Order releasing petitioner.

Thus, although the petitioner's allegations of conspiracy were not considered by the Court upon granting the petition, they have become relevant to fashioning a remedy. In addition, although the Court refused to consider the confidential psychological evaluation of Dr. Ferguson in deciding to grant respondents' motion to reconsider, it impliedly considered it in granting the stay and denying petitioner's subsequent motion to vacate the stay. Therefore, Dr. Cooke's evaluation, which rebuts respondents' confidential psychological evaluation and their assertion that petitioner, if released, would be a danger to the public, also becomes relevant at this juncture.

### A.  *Respondents' Contentions*

Respondents contend that the instant petition for a writ of habeas corpus should be dismissed in its entirety or, in the alternative, that the case should be remanded

to the Parole Board because this Court is without authority to order petitioner's release on the basis that the extended FET imposed was not supported by the evidence before the Board. Respondents incorporate by reference their February, 2000 submission, including a ninety-two page motion to dismiss the petition, accompanied by two volumes containing fifty-one exhibits as well as transcripts of the July 6, 1995 probable cause hearing and the September 29, 1995 hearing on the application for accelerated revocation.[5]

The main point in respondent's February 2000 submission was that the Appellate Division's decision was supported by the record, which respondents contend established that petitioner's parole was revoked and a sixty-month FET was imposed based on the undisputed facts, when taken in the context of his prior sentence for murder and kidnaping, that (1) he possessed in excess of 50 grams of marijuana, (2) he admitted using marijuana while on parole, (3) he threatened violence to an individual and the individual's family, and (4) he associated with outlaw bikers. These circumstances were advanced to show that "immediately upon parole, Hunterson fell back into the type of conduct which led to his initial convictions for serious crimes."

The respondents' second point in February of 2000 was that there was no evidence of selective prosecution against the petitioner, as (1) the statistics do not support a claim of selective enforcement based upon discriminatory revocation of parole because approximately 219 "lifers" have been returned to jail as parole violators [6] and there have been seventy-nine instances where the Bureau of Parole has applied for accelerated revocation proceedings stemming from a drug-related offense, and (2) petitioner has not established intentional, purposeful discrimination stemming from impermissible considerations.[7]

In their brief in support of the instant motion to dismiss, respondents elaborate on the February 2000 submission to argue that petitioner's deposition testimony confirms that many of his allegations are "pure speculation" and that he, therefore, has failed to demonstrate that the Appellate Division's decision was based on either an unreasonable interpretation of Supreme Court precedent or an unreasonable determination of the facts as presented in the State court proceeding. Specifically, respondents argue that petitioner admitted that his allegations regarding the allegedly tainted urine specimen were based upon

---

**5.** In that brief, respondents stated that they "apologize to this court for any role that they may have played in not comprehensively presenting the record below to this court in their previous submissions" (p. 50) and "[t]his court appears to have relied on Hunterson's analysis in its previous decision, now under reconsideration as previously noted, that led to this court being misinformed (and respondents must accept some blame for not better informing the court in this regard) regarding his conduct and its cumulative impact" (p. 78). It appeared to the Court, and still appears, that the February 2000 filing was respondents' attempt to answer the February 1998 petition after acting as if the case did not exist and ignoring that (a) this Court pleaded for a substantive submission prior to

making a decision, (b) this Court did make a decision, and (c) this Court previously ruled on an actual Motion for Reconsideration.

**6.** The records do not reference the specific violations that caused the parolees to be returned to custody.

**7.** The Court summarily denied the February 2000 motion to dismiss, as discussed above, as it was in the nature of an Answer to the petition which should have been submitted before this Court rendered its September 10, 1998 Order. Insofar as the motion had been submitted as a motion for reconsideration, it clearly was filed out of time, and the Court had decided a motion for reconsideration timely filed by the respondents.

his own theory or belief. Also, they argue that petitioner conceded, during his deposition, that he has no reason to believe that the current Commissioner of the Department of Corrections, Jack Terhune, is part of any conspiracy against him, or that there is a continuing conspiracy with regard to the entire Parole Board. Rather, he stated that certain Board members would be biased against him.

Respondents also directly address the issue to be decided by arguing that the appropriate remedy in this case would be to remand the matter to the Parole Board to cure any defect found by this Court. Respondents acknowledge that this Court already found that the Board's establishment of an extended FET, which was four times the fifteen-month statutory presumptive FET that otherwise would have applied, was not supported by the evidence before the Board. Although they disagree with the Court's determination, respondents argue that the presumptive remedy in such an instance is remand to the Board for further proceedings consistent with this Court's findings of law and fact. To further facilitate this remedy, respondents have produced an affidavit of the current Vice Chairman of the New Jersey State Parole Board, William McCargo, indicating that the two Board members petitioner identified as biased against him, Rachel Chowaniec and Rolando Gomez–Rivera, would not have any involvement in any determination regarding petitioner's case. Nor would any Board member who previously had any involvement in petitioner's case, including Ruby Washington, sit on any future panel regarding petitioner. Additionally, Mario Paparozzi, now Chairman of the New Jersey State Parole Board, submitted his own affidavit claiming that he "will recuse [himself] from any

involvement in any subsequent parole hearing of [petitioner] should this case be remanded to the New Jersey State Parole Board."

## B. *Petitioner's Contentions*

Petitioner's "Brief in Support of Release" argues, through counsel, that the appropriate remedy in this case is his release from custody pursuant to this Court's September 10, 1998 Order because he has marshaled evidence through discovery which indicates that there are unique circumstances present in the form of "constitutional infirmities" and as a result the ordinary remedy of remand to the Parole Board would be inadequate and inappropriate.

It has been petitioner's contention from the outset of this litigation that there exists a conspiracy against him within New Jersey Department of Corrections. Petitioner reasons that the conspiracy stems from (1) the amorous relationship he developed with Deborah Hansen, former Director of the Office of Interstate Services of the Department of Corrections, and former Deputy Compact Administrator; (2) his repeated success before the Appellate Division, including obtaining release on December 23, 1994; (3) his and Ms. Hansen's attempts to expose an interstate "scheme" controlled by the Bureau of Parole to place parolees in "receiving states" where they would drain welfare and Medicaid funds, including (a) their speaking out at a May 26, 1995 event, (b) their attendance on June 8, 1995 at the New Jersey Senate Judiciary Hearings questioning former Commissioner of New Jersey's DOC, William Fauver, regarding the acceptance and supervision of Robert "Mudman" Simon, a Pennsylvania parolee under the Interstate Compact of Parolees,[8]

---

8. Apparently, Fauver reported that he was unaware that New Jersey could have refused to supervise out-of-state parolees like Simon.

Petitioner and Hansen publicly criticized Fauver's position.

(c) Ms. Hansen's assistance to a State Senator in studying the "scheme," and (d) Ms. Hansen's interview on the State House steps where she contradicted a joint Fauver Poritz report. Petitioner alleges that beginning in May of 1995, the Parole Board, by Andrew Consovoy, and the DOC Bureau of Parole, by Mario Paparozzi, combined resources to retaliate against him through selective prosecution. Petitioner argues that newly discovered evidence demonstrates this political retaliation.

### 1. Joint Investigation

Petitioner contends the record supports his allegations that DOC personnel worked tirelessly to sever his relationship with Ms. Hansen and to retaliate against her and selectively prosecute him. He cites to a June 20, 1995 document from Assistant District Parole Supervisor Calvin Weatherby to District Parole Supervisor Paul Wentzel, indicating that Mario Paparozzi provided Weatherby with Internal Affairs reports allegedly investigating the relationship. Likewise, copies of the charges against Ms. Hansen allegedly were provided to Consovoy and placed in petitioner's parole file. Petitioner also alleges that he was questioned by Consovoy at his parole hearings about his relationship with Ms. Hansen and that Consovoy continued to show an interest in the relationship, even after allegedly recusing himself from further involvement in petitioner's case on May 22, 1998, by reading the January 1999 transcript of Hansen's administrative law termination hearing. Petitioner further contends that various Parole Board panels' questioning of him regarding Ms. Hansen went well beyond exploring his parole plans.

### 2. June 14, 1995 "Strategy Meeting"

On June 14, 1995, the day before petitioner's probable cause hearing (under the jurisdiction of the Bureau of Parole, not the Board), then Parole Board member Andrew Consovoy, Parole Board attorney Douglas Chiesa, Deputy Attorney General Howard McCoach, and then Deputy Attorney General (now Executive Director of the Parole Board) Michael Carlin met at the Parole Board office. This meeting was initiated by Consovoy and the subject was the petitioner.

As a result of the June 14, 1995 meeting, Paparozzi, as Assistant Chief, sent a confidential internal memorandum to Debbie Faunce, Chief of Internal Affairs for the Department of Corrections. This memo reports that Consovoy phoned him on June 5, 1995 to inform him that another Board member had heard "rumors" to the effect that petitioner "had made threats to kill someone." Paparozzi, in turn, phoned Wentzel, who said that, indeed, two parole officers had learned of that information when they ran into Investigator Levins, of the Camden County Prosecutor's Office, at a seminar. Paparozzi called Wentzel again on June 7, 1995, but instead got Weatherby on the phone, and told him that Paparozzi wanted an officer to investigate the matter immediately and provide Paparozzi with a detailed report of the findings. Paparozzi received the report on June 13, 1995 and was provided with a tape of the phone call the same day by a Robert Romoser who found it in a file drawer containing petitioner's file. Paparozzi followed up with Levins who allegedly informed him that Ralph DeFabio, President of the Philadelphia Chapter of the Warlocks, reported that petitioner threatened his life during a phone call on July 8, 1992. At that point, DeFabio began to tape all of his phone calls. When petitioner called him again on August 5, 1992, a recording was made. The Camden County Prosecutor's Office decided not to charge petitioner because the case against him was weak. Nonetheless, according to Paparozzi's memo, the tape recording of

the call was turned over to Rise Dawson of OIS as early as August 7, 1992.

The consensus among the attorneys present, McCoach, Carlin, and Chiesa, was that the "threats" made by petitioner in 1992 could not be used as a basis for revocation on June 15, 1995.

### 3. Andrew Consovoy

Petitioner contends that the affidavit, testimony, and parole hearing findings of Andrew Consovoy reflect that this individual is less than credible and that he had no problem contradicting himself to bring about the desired result—keeping petitioner incarcerated.

On October 19, 1994, Consovoy approved a Parole Board warrant for accelerated revocation with Rolando Gomez–Rivera. Petitioner alleges that in May of 1995, Consovoy was responsible for lifting the November 15, 1994 indefinite postponement of revocation proceedings approved by the Bureau of Parole [9] and rescheduled the probable cause hearing for June 15, 1995, prior to any adjudication on the possession charge and at about the same time as the above-referenced media exposure. Consovoy arranged the June 14, 1995 meeting, discussed above, the day before petitioner's probable cause hearing to ascertain whether the DeFabio tapes could be used to revoke petitioner's parole. Although on June 20, 1995, the Appellate Division vacated the Board's June 15, 1995 warrant for lack of probable cause due to failure to follow procedures (there was no finding that the charge was serious or that petitioner posed a danger, and there was no emergency because petitioner was arrested nine months before the June 15, 1995 parole warrant), Consovoy was undeterred. His attorney, Deputy Attorney General Howard McCoach sought and was granted a stay of the June 20, 1995 Appellate Division order releasing petitioner to allow the Chief of the Bureau of Parole to apply to the Parole Board for accelerated parole revocation proceedings by June 27, 1995. Then, petitioner alleges, McCoach was sent by Consovoy to Chief D'Ilio to make sure the third warrant would be secure.

On June 27, 1995, despite the June 14, 1995 consensus, that the "threats" could not be used as a basis for revocation, D'Ilio applied for accelerated revocation using "threat to kill" DeFabio in order to satisfy the statutory standard of danger to the public, and posturing that the threat was not raised before because Hansen deliberately concealed the tape of the threat. On June 28, 1995, Consovoy and Rolando Gomez–Rivera approved D'Ilio's warrant application for continued detention based on the premise that the petitioner threatened to kill a member of the Warlocks motorcycle club. Thus, on June 30, 1995, the New Jersey Supreme Court lifted the stay and ordered petitioner held in detention pending a July 6, 1995 probable cause hearing. On July 20, 1995, the Appellate Division overturned the Consovoy-approved warrant, only to be reversed by the Supreme Court without explanation.

With this history in the record, Consovoy testified at deposition in August of 2000 that he did not play any role at all in the 1995 revocation process.

Consovoy also filed an affidavit with this Court in 1998 stating that, as a result of the DeFabio phone calls, a special condition of parole was placed on petitioner that mandated no contact with any individuals associated with motorcycle gangs. There is no such special condition in the record, and, indeed, respondents conceded at oral

---

**9.** Petitioner had received a letter stating that his Probable Cause Hearing was indefinitely postponed pending the outcome of his marijuana charge.

argument that no such special condition existed.

Consovoy's affidavit also stated that the Parole Board was unaware of petitioner's transfer of parole supervision from Utah to Florida to New Jersey, and if the Board had been informed, petitioner likely would have been returned to custody because it was the Board's position that petitioner's only suitable parole plan was to Utah. Consovoy was characterizing the Board's lack of knowledge of petitioner's location as the result of a deliberate attempt by Hansen to keep the Board in the dark. During his deposition, however, Consovoy testified that the Board would not generally have been made aware of a change of condition like a transfer to another state.[10] In fact, petitioner contends that during his February 13, 1998 panel hearing, Consovoy told petitioner that there was no illegality in the transfers and no parole violation as a result. He cites the February 13, 1998 panel hearing transcript at page 123:

> CONSOVOY: Okay, Okay. The reason I'm asking you where you were is those movements I don't care about because there's no illegality.
>
> HUNTERSON: No.
>
> CONSOVOY: —or even a parole violation attached to it because you had permission.

### 4. The February 13, 1998 Hearing— Problems with the Panel and the Standard

Petitioner contends that during an October 1997 parole hearing for a prisoner at Riverfront State Prison, a two-member panel composed of Consovoy and Ruby Washington delved into an unauthorized criminal investigation line of questioning, seeking to connect petitioner with the parole candidate's crime. Petitioner thereafter informed his parole counselor at Southern State Correctional Facility, and requested that Consovoy and Washington recuse themselves from petitioner's parole hearing, scheduled for February 13, 1998. The parole counselor informed petitioner that he would call Parole Board Chairperson Mary Keating DiSabato and relay the information to her. Petitioner alleges that DiSabato's non-action on petitioner's request for an impartial panel was vindictive, or, at the very least, showed that she acquiesced in further selective prosecution and political retaliation. Although petitioner was able to voice his objections prior to the actual parole hearing, Consovoy and Washington refused to recuse themselves. Petitioner argues that this hearing was unconstitutional.

At the February 13, 1998 hearing, petitioner contends that Consovoy began by stating that the disorderly persons offense was "not the issue," but that the Board had the obligation to determine whether the punitive aspects of petitioner's life sentence had been satisfied. To support the Board's position, Consovoy used examples of inmates serving life sentences who had never been paroled. Citing *Trantino v. New Jersey State Parole Board*, 154 N.J. 19, 26, 711 A.2d 260 (1998) (holding that the determination of the parole of a Title 2A inmate must take into account the punitive aspects of the sentence), petitioner alleges that Consovoy's thinking reflects a fundamental error, in that future eligibility terms established in such cases are dissimilar to those imposed on parole violators, because the presumption of likelihood of dangerousness and/or the question of

---

**10.** Moreover, Hansen submitted an Affidavit "in opposition" to Consovoy's, stating that the Parole Board never submitted anything to the Office of Interstate Services expressing a concern that petitioner remain in Utah, and that the Board has no legal authority to banish a parolee from his state of conviction and no right to force a parolee on another jurisdiction.

whether the punitive aspect of a sentence has been served no longer exists. *See also Trantino v. New Jersey State Parole Board*, 166 N.J. 113, 127, 764 A.2d 940, 948 (2001).

The panel's decision was to defer for an in-depth psychological evaluation.

### 5. The May 21, 1998 Hearing Results in Alleged Retaliation

Petitioner alleges that on May 21, 1998, Consovoy and Ruby Washington reconvened the February 13, 1998 hearing questioning petitioner on the DeFabio call, with an in-depth psychological report by Glen Ferguson in hand. They denied petitioner reinstatement on parole, and established a thirty-six month future eligibility term. The following day, however, the Board rescinded that decision, and Consovoy recused himself from all future matters involving petitioner. The reason [11] was that early in the morning on May 22, 1998, after receiving word that petitioner had been denied parole, Hansen left a message on the voice mail system of Douglas Chiesa, attorney for the Board, expressing her displeasure with the decision and with Consovoy's accusations regarding her during the petitioner's parole hearings. Consovoy and Chiesa filed a formal complaint with the State Police as a result of the call, charging that Hansen had threatened them by her words, "the court will be the least of Mr. Consovoy's worries." The State Police made a record of the complaint, but advised the two that there was no threat. Rather, the investigating officer wrote that Hansen "expresses obvious outrage over the matter of Hunterson's parole. She accuses Chiesa of dishonesty. She threatens to subpoena Chiesa to a hearing appealing her dismissal and, finally, makes the statement about Consovoy. At no time does the caller utter a threat." Petitioner contends that the real reason behind Consovoy's decision to rescind the thirty-six month FET was vindictiveness and retaliation.

### 6. The May 27, 1998 Hearing—the Original Crime & the DeFabio Incident Revisited

On May 27, 1998, Gomez and Chowaniec conducted another panel hearing. Petitioner alleges that due to their past history with him, the mere involvement of these two individuals on his panel violated his rights and the Board's code of professional conduct.[12] He further contends that they were selected on the basis that they would be the two Board members most likely to "deliver political reprisal." He submits that the transcript reveals they questioned him for two-thirds of the hearing, or the first 100 pages of the transcript, about the crime for which he was paroled in 1992. He also argues that the September 9 and November 30, 1998 Notices of Decision improperly utilize the interstate transfers

---

11. Petitioner contends that this reason did not come to light until Consovoy filed the September 14, 1998 affidavit.

12. Petitioner lists: on November 19, 1994, Gomez–Rivera approved and signed the first Bureau application for an accelerated revocation warrant (later vacated by the Appellate Division); on November 28, 1994, he denied the request to lift the accelerated revocation warrant after one of the charges against petitioner was dropped by the Camden County Prosecutor's Office; in May of 1995, he either participated in or acquiesced in the decision to rescind the November 15, 1994 indefinite postponement to reinstitute revocation proceedings; Chowaniec was part of the two-member panel that referred petitioner's case to a three-member panel to establish an FET outside the guidelines on November 1, 1995; on January 24, 1996, Chowaniec and Gomez–Rivera were part of the three-member panel that established a five-year FET prior to any finding of guilt, and they affirmed their decision upon remand on April 10, 1996; the two also sat as part of the August 28, 1996 full Board panel which denied petitioner's administrative appeal of the April 10, 1996 decision.

to support a denial of parole and reference the transcript of the August 5, 1992 telephone call, although it was not part of the questioning from May 27, 1998 or October 21, 1998.

### C. *The Current Record*

1. Background to the Time of this Court's September 10, 1998 Decision

In evaluating the record, the Court is well-aware that petitioner was given two concurrent life sentences on July 28, 1972. He was released on parole July 29, 1992. At the time he was granted parole, petitioner was warned that his parole could be revoked for serious or persistent violations of the conditions of parole, including the condition that he obey all laws and ordinances and the condition that he refrain from the use of any controlled dangerous substance.

It appears that during the first half of 1994, the Department of Corrections, Bureau of Parole, learned of the relationship between Hansen and petitioner. On May 17, 1994, Hansen was suspended and administrative actions against her were commenced. On September 29, 1994, petitioner was arrested on a charge of possession of marijuana, which was downgraded to a disorderly persons offense. He was released on his own recognizance at the time. He was later arrested on a parole violator warrant, first based on allegedly "dirty" urine specimens, then on the specimens and the marijuana arrest, and finally, based only on the arrest. By the end of 1994, as outlined above and discussed in this Court's September 10, 1998 Order, the first two parole violator warrants had been vacated by the Appellate Division and petitioner had been sent a letter indicating that the probable cause hearing on the third warrant was postponed indefinitely pending the outcome of his arrest on the marijuana possession charge.

Petitioner has provided documentation that in May of 1995, he and Hansen began to criticize William Fauver publicly, as briefly discussed above. Despite the letter notifying petitioner of the indefinite postponement, he was alerted, just one week after he attended the State Senate judiciary hearing and, along with Hansen, publicly criticized Fauver, that his probable cause hearing would take place on June 15, 1995.

A June 26, 1995 Inter–Office memorandum from Victor D'Ilio, Chief of the Bureau of Parole and brother-in-law of William Fauver, to Parole Board Chairperson DiSabato, indicated that D'Ilio applied for accelerated revocation proceedings on petitioner. He stated that he determined petitioner was a danger to the public safety based on factors other than the September 1994 arrest. They include: that he was on parole from serving time for murder and kidnaping, the circumstances of the underlying crime were violent, and petitioner had a criminal record prior to arrest for the underlying crime; petitioner admitted to having used drugs in one form or another since the age of 15; petitioner was a member of a motorcycle "gang"; he was the subject of disciplinary charges in prison between 1983 and 1986 and in 1988; his psychological profile type tends to be impulsive and irresponsible, manipulative and self-serving; petitioner admitted marijuana use in March of 1994 since the previous Christmas; the Winslow Township Police made a report on an alleged threat petitioner made to his half-brother in April, 1994, although the victim never signed a complaint; the Camden County Prosecutor's Office had a record of alleged threats petitioner made in 1992; petitioner was associating with motorcycle gang members in April of 1995.

Despite D'Ilio's four-page memorandum, on July 10, 1995, Hearing Officer Charles

Anderson determined that the testimony presented at the July 6, 1995 Probable Cause Hearing [13] weighed in favor of releasing petitioner on parole pending a final revocation hearing.

On July 10, 1995, the Parole Board stayed the hearing officer's decision and requested a further statement from him as to why he decided to continue petitioner on parole. On July 11, 1995, Assistant Chief Mario Paparozzi telephoned the hearing officer, also instructing him to write a report stating why he determined that petitioner should be released from custody pending a final revocation hearing. As this Court noted in its September 10, 1998 decision, the hearing officer sent a memorandum to Paparozzi on July 12, 1995,[14] stating that since he had rendered his decision, he received three to four memoranda from the Chief's Office and the Parole Board, and "numerous telephone calls as well." The Court previously noted its concern with this set of circumstances, as it suggests that petitioner's impending release caused much agitation with higher officials in the Bureau and the Board.

D'Ilio sent a memorandum to DiSabato on July 12, 1995, attaching the hearing officer's July 10, 1995 determination. Finally, in a July 13, 1995 Inter–Office Memorandum to D'Ilio, the hearing officer indicated that he had carefully reviewed the testimony and "factors" presented by D'Ilio's request for an Accelerated Revocation Hearing, but concluded that the witnesses at the hearing simply did not give testimony to indicate that petitioner was a threat to the community. DiSabato, by

Inter–Office Memo dated July 14, 1995, announced that it was the decision of the Parole Board to reverse the hearing officer's determination because he did not adequately address the factors raised in D'Ilio's June memorandum.

In reversing this reversal on July 20, 1995, the Appellate Division's Opinion held that petitioner should have been released pending a final revocation hearing because the record did not support a finding that the offense charged was serious or that petitioner was a danger to the public safety. The Opinion took into account D'Ilio's statement revisiting the original crime, petitioner's admitted marijuana use, the De-Fabio "threats to kill" and another 1994 alleged threat against petitioner's half-brother, a notation by the police officer who arrested petitioner for possession of marijuana on September 29, 1994 that he was "making furtive movements in the car" before pulling over, and a State Police report that petitioner was present at the April 21, 1995 Pagan Motorcycle Club benefit. The Appellate Division noted that no determination was made, pursuant to N.J. Stat. Ann. § 10A:71–7.3, that the charge against petitioner was of a serious nature. In addition, the court revisited the preliminary hearing held on July 6, 1995 pursuant to N.J. Stat. Ann. §§ 10A:71–7.4 and –7.8, which require that a parolee be found to have "seriously or persistently violated conditions of parole." The court reviewed the record of the hearing:

> At the hearing, Officer Bitchakjian related the events surrounding Hunterson's

---

13. The Court again notes that one of petitioner's parole officers, after giving favorable testimony on his behalf at the July 6, 1995 hearing, received an unscheduled personnel assessment hours after she testified, and was lowered two levels.

14. Hearing officer Anderson outlined his reasoning as based on: 1) the favorable testimo-

ny of senior parole officers Torres, Piccurelli, and Flannery who supervised petitioner, 2) the favorable testimony of defense witnesses, including petitioner's employer, neighbor, and fiance, who attested to a stable employment environment and residence, and 3) the nature of the charge and the testimony of the arresting officer.

arrest for the fourth-degree drug offense. Hunterson's three parole officers testified along with his employer and several character witnesses. The import of this testimony was that Hunterson never evidenced any problems on parole, could be expected to show up at a final revocation hearing and constitutes no threat to the public. *In short, not a shred of evidence suggesting that he is a danger to society was adduced at the hearing.* As a result, the hearing officer found that while there was evidence that Hunterson violated the parole condition that he obey all laws and ordinances, there was no evidence to warrant the conclusion required under N.J.A.C. 10A:71–7.10 that Hunterson "poses a danger to the public safety" or that he "may not appear at the revocation hearing." ... [The Parole Board reversed this finding of the hearing officer, stating that it was] "concerned that the hearing officer failed to adequately address the factors noted in Chief D'Ilio's application dated June 28, 1995 in regards to the danger Mr. Hunterson could present to the public safety if released pending a final revocation hearing and that the factors presented in Chief D'Ilio's application outweigh the mitigating information presented on Mr. Hunterson's behalf."

\*    \*    \*    \*    \*    \*

The problem with the Board's decision is that it fails to recognize that the Chief's application was nothing more than a charging document. Evidence of Hunterson's dangerousness occurring after his initial parole had to be adduced at the hearing in some reliable form. Witnesses were not presented to verify the alleged threats by Hunterson. Neither was there a suggestion in the rec-

ord that by attending a biker's soiree he violated a term or condition of parole.

\*    \*    \*    \*    \*    \*

While materials of record such as a conviction or an indictment contained in a charging document may be considered by the hearing officer, hearsay statements of unknown witnesses once or twice removed are not so cognizable. The hearing officer understood that. The Board obviously does not.

(Emphasis added.)

On receiving this Opinion from the Appellate Division, respondents applied to the New Jersey Supreme Court on July 21, 1995 for a stay. The stay was granted, and on July 25, 1995, without explanation, the New Jersey Supreme Court reversed the Appellate Division's Order to release petitioner.

On September 29, 1995, Hearing Officer Timothy Murphy conducted a final parole revocation hearing, with Mario Paparozzi as Special Prosecutor for the Bureau of Parole.[15] The hearing summary was released on October 30, 1995 and by a November 1, 1995 Notice of Decision, a two-member adult panel consisting of Rachel Chowaniec and Francis Schuman revoked petitioner's parole and referred his case to a three-member panel to impose a term outside the guidelines. On January 24, 1996, Rachel Chowaniec, Francis Shumann, and Rolando Gomez–Rivera established five-year FET, again, *prior to any finding of guilt* on the marijuana charge that triggered the revocation process. It was the September 29, 1995 hearing and the decisions that were rendered as a result which formed the basis for this Court's September 10, 1998 analysis. Those determinations from the Fall of 1995 onward need not be revisited here, as a thorough discussion is included in the

---

**15.** Paparozzi testified at deposition that Fauver had called him and asked if he "would

handle this case." (Paparozzi Dep., Tr. at 40.)

September 10, 1998 Order, which is incorporated as part of the current decision.

### 2. The September 9, 1998 Notice of Decision

The suspiciously dated Notice of Decision that ultimately resulted in an eight-year FET was based on the May 27, 1998 hearing before Gomez–Rivera and Chowaniec. By this Notice of Decision, the two-member adult panel of the Board denied petitioner parole upon completion of the illegal five-year "hit" and referred his case to a three-member panel to set a future eligibility term outside the guidelines.

At the outset of the fifteen-page decision, it is striking to this Court that the panel states, "A review of your case begins with a review of your childhood" and then proceeds to recount how petitioner was adopted soon after birth, was raised with knowledge of the adoption, and had little knowledge of his natural parents beyond that his natural mother was an alcoholic. The decision then reviews petitioner's illicit drug use, as revealed by petitioner to a probation officer, from age fifteen through the time he committed the original offense. Next, the author comments upon petitioner's military service, including that petitioner may or may not have revealed during a later psychological evaluation, that he had homicidal thoughts in the line of duty while serving in Vietnam. The decision states that the Board was unable to verify petitioner's service.

The decision also recounts how petitioner was invited to join a motorcycle club in August of 1968, and that soon after, he was arrested frequently for mainly disorderly persons offenses. The decision then describes in detail petitioner's 1971 crime. Petitioner apparently had been questioned extensively at the May 27, 1998 hearing about why he had committed the underlying offense, but did not respond with a reason, ultimately answering, "I don't know why; I can't tell you why." This answer was "especially disconcerting to the Panel because it is an indication to the Panel that so many years after this event occurred, you still have no insight into what factors led you to commit this heinous offense."

The panel then reports that petitioner was first eligible for parole in 1989, but was denied parole release at that time and given a five-year future eligibility term due to the nature of his offense, his prior criminal history, and his record of infractions while institutionalized. However, petitioner was transferred to Utah to serve his sentence, and at some point his institutional behavior had changed for the better. On July 8, 1992, petitioner was given a parole release date of July 29, 1992.

Next, the panel integrates the phone calls to DeFabio by including the entire transcript from the August 5, 1992 call. The panel describes how the calls were reported to the Office of Interstate Services, supervised at the time by Hansen, but that the calls were never reported to the Parole Board. The decision states a position repeated verbatim in Consovoy's affidavit, that if the Board had been made aware of the July 8, 1992 call, it would have rescinded parole; if it had been made aware of August 5, 1992 call after petitioner's release, it would have revoked parole.[16] Troubling to the Court is that,

---

16. It is clear from the record, however, that the Camden County Prosecutor's Office and the Department of Corrections were in contact regarding the DeFabio calls.

The September 29, 1995 Accelerated Revocation Hearing Transcript, reveals that Investigator Levins did have someone contact Trenton State Prison on July 9, 1992, and that person was advised that Hunterson was to be transferred to Utah as part of a prisoner exchange program. Then, the investigator contacted Rise Dawson, unit supervisor, by August 8 to discuss the phone calls with her, as

after having stated that a special condition of petitioner's parole was that he was to be paroled to Utah, the panel characterizes petitioner's transfer from Utah to Florida as "in violation of the Parole Act" despite the fact that the transfer was approved by the Office of Interstate Services (and despite Consovoy's "admission" that, as a result, the transfer did not constitute a violation).

The panel notes (as if it were the fault of petitioner), "[i]t is difficult to ascertain exactly how you were doing on parole through 1995 since parole officer chronological reports were in many cases illegible." Conveniently, two reports that were "decipherable" revealed that petitioner had admitted to his parole officer that he had been using marijuana from Christmas until March of 1994. The panel also notes that when he was questioned about the marijuana use by a psychologist during a March 11, 1998 evaluation, petitioner "made the ludicrous claim that your parole officer instructed you to go out and party because you were working too hard. In the opinion of the Adult Panel, this is another indication of your continued need to rationalize your marijuana use." [17]

The panel also points to petitioner's attendance at the April 21, 1995 benefit as indicative that he "continued to associate with members of motorcycle gangs."

The standard used by the panel, pursuant to N.J. Stat. Ann. § 30:4–123.53(a), is that "an adult inmate shall be released at

---

a representative of the Department of Corrections.

The testimony of Rise Dawson discloses that when she was first contacted by Levins, he advised her not to tell petitioner that he was the subject of an investigation as the result of the threats. When the investigation concluded, petitioner was not violated, no charges were brought against him, and the matter was dropped.

Rise Dawson also testified at the September 29, 1995 Accelerated Revocation Hearing that the Office of Interstate Services had primary jurisdiction over petitioner during the time of the phone calls, and it was that agency which would have been responsible for making determinations about the information received. That agency would not have notified the Board unless there existed serious or persistent behavior or a new arrest or new charges.

An affidavit filed by Hansen, in her capacity as Deputy Compact Administrator and manager of the Office of Interstate Services for the New Jersey Department of Corrections, corroborated Dawson's testimony. Hansen stated she was aware of the DeFabio calls and participated in the decision concerning the handling of the information provided by the prosecutor's office. This occurred well-before she became romantically involved with petitioner, some time after March or April of 1993. Hansen confirms that Levins contacted the Office of Interstate Services during the last week of July, 1992 to ascertain petitioner's whereabouts. Some time after petitioner was paroled, on or about August 18, 1992, Levins again contacted Hansen's office and spoke to unit supervisor Rise Dawson. Dawson agreed to listen to the tape of the second DeFabio call and identified petitioner's voice on the tape. When Dawson returned to the office with a copy of the tape (according to Hansen, on August 28, 1992), Hansen, Robert Romoser, and Dawson listened to the tape together and the three jointly decided that petitioner's words did not rise to the level of terroristic threats. They spoke to Levins by speaker phone, inquiring whether the prosecutor's office would be taking any action and were informed that in his opinion the conversation was not sufficient to justify criminal charges, and that no further action would be taken. The three informed Levins that they intended to counsel petitioner that communications with DeFabio were nonproductive to his reintegration efforts and that petitioner should cease all contact with him. They did so immediately, again jointly via speaker phone.

17. The Court is aware that in prior testimony parole officer Elaine Torres confesses that she did indeed tell petitioner to "go out and party" because of the stresses he was facing at the time, including dealing with his very ill mother. (*See* September 29, 1995 Tr. at p. 204.)

the time of his parole eligibility unless a preponderance of evidence indicates that there is a substantial likelihood that the inmate will commit a new crime if released on parole." Further, the panel cites N.J. Stat. Ann. § 30:4–123.58(c) and states, that it may review all relevant information in determining an inmate's "parole suitability."

In denying petitioner parole, the panel relied upon (1) the facts and circumstances of the original offense, including that petitioner showed "no insight" into the cause of his actions and that he had no insight into the causes of his drug problem; (2) petitioner's tendency to minimize his previous record (prior to the 1971 offense) and his tendency to minimize the marijuana possession offense by referring to it as a "disorderly persons offense" combined with his lack of insight into what led him to commit the offenses; (3) the fact that since his parole was revoked, petitioner did not participate in any counseling programs while incarcerated; (4) a March 25, 1998 psychological evaluation; (5) the panel's fear that petitioner would revert to criminal behavior if placed in a stressful situation along with his fiancee, because petitioner's proposed parole plan included living with his fiancee who had an acknowledged drinking problem in the past, especially when fighting with the DOC, and because petitioner had admitted turning to marijuana when under stress in the past; (6) the assessment that petitioner's "prior experiences on parole are atrocious" in that (a) he made the DeFabio calls while on parole, (b) he "eventually [had his] parole supervision transferred from Utah to Florida to New Jersey, without the approval of the New Jersey State Parole Board, and only with the illegal approval of transfer by the Office of Interstate Services and the Bureau of Parole"; (c) he returned to drug use while on parole; and (d) he continued to associate with motorcycle gang members after release on parole.

In mitigation, the panel noted only that petitioner had worked as a paralegal while incarcerated and that he remained charge-free since reincarceration.

### 3. Respondents' Actions after this Court's September 10, 1998 Decision

On October 21, 1998, petitioner appeared before a three-member adult panel comprised of Rachel Chowaniec, Rolando Gomez–Rivera, and Ruby Washington. This panel established an eight-year future eligibility term by Notice of Decision dated November 30, 1998. The Board members copied the first ten pages of the decision from the September 9, 1998 opinion and reiterated that petitioner had "no insight into what psychological factors may have led [him] to become a member and a leader of a motorcycle gang that would lead to [his] involvement in the commission of numerous criminal offenses prior to committing murder." The panel found that, under N.J. Admin. Code § 10A:71–3.21(d), the presumptive future eligibility term was "inappropriate in light of the facts and circumstances of the offense, the inmate's prior criminal record, and the inmate's institutional behavior .... all three criteria have clearly been met justifying an extended future eligibility term of eight years."

The panel then recounted the original crime, characterizing it as the "slaughter of a defenseless victim," reiterating how petitioner could not express *why* he committed the offense, although he accepted responsibility for his actions. The members discussed the "lack of psychological insight" as to the reasons behind the crime, and found the same troubling "in light of the fact that [petitioner] committed the offense in 1972 and ha[s] had during [his] incarceration opportunities to address these issues in psychological counseling sessions."

The panel reasoned that it considered petitioner's prior criminal record in assessing his future parole eligibility term. It characterized petitioner's prior criminal record, that is, petitioner's record before the underlying offense, as "extensive," "heavily influenced by [his] involvement and leadership in a motorcycle gang association that was very involved in criminal activity and drug use." Again, the panel was "most disturbed" by petitioner's "current lack of insight into the psychological factors" that led to his prior criminal record.

Finally, the panel stated that it is "very concerned" with petitioner's institutional behavior, "specifically [his] lack of psychological counseling in addressing issues referred to" by the decision, "such as why [he has] in the past reflected a need to associate with individuals involved in criminal activity and the causes of [his] substance abuse problem."[18] The panel concluded, "In sum, the Panel is of the opinion an eight year future eligibility term is appropriate in your case. It is hoped that prior to your next hearing you address in counseling issues referred to in this opinion."

Thus, petitioner was given an eight-year FET on top of the five-year FET successfully challenged before this Court.

4. Confidential Psychological Evaluation

The September 9 and November 30, 1998 Notices of Decision both relied upon a March 11, 1998 psychological evaluation by Glen Ferguson, Ph.D. The Court notes at the outset that the March 25, 1998 report generated as a result of the evaluation discloses:

There is no record of juvenile delinquency and Neil disclaims same. There are twelve adult arrests prior to the present offense. The bulk of these offenses are misdemeanor violent offenses, with the exception of three indictable convictions for weapons and drug offenses, committed subsequent to his murder and kidnaping offense. Neil attributes all of his criminal activity to his gang involvement with the Henchmen. He describes his participation in this gang as stemming from feelings of disillusionment with traditional American culture. He describes returning from Vietnam as a changed person. He reports feeling accepted by the Henchmen, many of whom he describes as Vietnam veterans. He reports reluctantly accepting the presidency of the club after the former president was gunned down by rival gang members. . . .

Thus, it appears that petitioner did have some insight into what led him to become associated with the motorcycle club, and apparently respondents' expert was aware of the circumstances. The Ferguson report concludes as follows:

Neil does not appear to be at high risk for violence in the foreseeable future. He reports an ability to channel his aggressive feelings into socially acceptable means. He was on parole for over two years and never acted on his threats toward Mr. DeFabio. He does appear to continue holding grudges, as evidenced by his comments regarding Mr. DeFabio and various DOC and SPB offi-

---

**18.** Actually, while in Utah from about June 4, 1990 until February 11, 1991, petitioner participated in individual and group counseling as well as AA; his progress notes were all favorable, ranging from good to excellent. Also, respondents have failed to indicate that any counseling program was offered to petitioner in which he refused to participate. *See New Jersey State Parole Board v. Cestari*, 224 N.J.Super. 534, 540 A.2d 1334, 1343 (App. Div.1988) (such a circumstance indicates lack of support for Board's denial of parole based on lack of counseling).

cials. He is viewed as an average risk for parole and as likely to recidivate as most other state prisoners.

High risk situations for Neil in the future include: 1) putting himself in a situation where he feels obligated to perform favors for known criminals, 2) relapsing into substance abuse, including marijuana, 3) being unaware of mounting stress in his daily life. These three factors appear to have contributed to his violation of parole, as well as his original murder and kidnaping conviction.

Should parole be granted the following special conditions are recommended:

1. ISSP with frequent random substance abuse screening.

2. Outpatient substance abuse counseling.

3. Outpatient stress management counseling.

4. Close monitoring of his personal and business relationships for escalating involvement with known criminals.

Despite this conclusion by the Board's own psychologist, the panel again concentrated only upon the negative aspects of the report, and came to its own conclusion that petitioner exhibits the personality traits of a psychopath and that clinically he is not much different from the person he was twenty-five years ago.

## D. *Evaluation*

The record created as a result of recent discovery has fortified this Court's opinion that the petitioner was not afforded due process during his parole revocation proceedings, because his fate was not determined by a neutral and detached hearing body as required by *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The record also has convinced the Court that the respondents'

administration still cannot provide petitioner the due process required by law.[19]

### I

Even a cursory review of the record reveals unique circumstances in this case; an in-depth examination after discovery exposes what the Appellate Division had characterized as "not a shred of evidence" to reasonably support the Parole Board's actions, but rather, decisions motivated by something other than the evidence. Perhaps coincidentally, one week after petitioner and Hansen publicly criticized William Fauver's testimony before a State Senate committee, petitioner's parole revocation was made a priority. The revocation proceedings came nine months after petitioner was charged with possessing marijuana, but before he had been adjudicated on the charge, in spite of an assurance that the Bureau would wait until a final determination on the charge to proceed with revocation.

There was a suspicious marshaling of interested persons prior to the probable cause hearing and memos depicting petitioner's activity as a parade of horrors since birth were generated and relied upon to fortify decisions. The record reflects an atmosphere of scurrying and scrambling when the probable cause hearing officer determined that although petitioner's parole should be revoked, he should be continued on parole pending final proceedings. First, there was an attempt to get the hearing officer to change his mind, and when that failed, the Board decided to overrule his soundly reasoned and amply supported determination in order to keep petitioner incarcerated.

Yet another unusual circumstance occurred when the Commissioner of the Department of Corrections personally called

---

**19.** The record reflects that Mario Paparozzi is now Chairman of the Parole Board, having replaced Consovoy. As recently as his November 13, 2000 appointment hearing, Deborah Hansen testified against Paparozzi before the State Senate Judiciary Committee.

upon Paparozzi to take action. At the final revocation hearing, testimony was taken from the officer who arrested petitioner a full year before the hearing. But since the arrest for possession obviously did not establish by clear and convincing evidence that petitioner had seriously or persistently violated the conditions of his parole, the hearing continued.

The Bureau called an investigator from New Jersey State Prison Internal Affairs, who testified that another inmate saw petitioner at a motorcycle club's event to raise funds for a member's legal defense. This testimony was used to corroborate the testimony of a trooper who stopped petitioner for speeding on the way to the event, and from whom petitioner elicited directions to the catering hall where the event was being held. As respondents conceded during oral argument, there was no special condition on petitioner's parole requiring that he refrain from associating with members of motorcycle clubs—outlaw or otherwise. Thus, there was still no serious or persistent violation of the conditions of parole.

Next, the Bureau introduced testimony about the DeFabio "threat," not through DeFabio, but through a lieutenant with the State Police and by the testimony of Investigator Levins, a member of the Camden County Prosecutor's Office. Putting aside the question of the threatening nature of the call because no charges resulted from it, the threat was not included to support any of the previous parole violator warrants and, more importantly, it occurred years before petitioner's arrest for marijuana possession, the event which was supposed to have triggered the revocation proceedings. As discussed during oral argument, even assuming there was a threat, the Board did not evaluate the fact that it was never carried out in the three years

that passed between the call and the time petitioner was violated. (Tr. at p. 16.) The Court finds this unusual.

On petitioner's behalf, there was the testimony of a neighbor and petitioner's employer, as well as favorable testimony from three of petitioner's parole officers. Petitioner also presented testimony from a representative of the Office of Interstate Services who attested to the fact that law enforcement authorities knew of the DeFabio calls at the time they were made but did not act upon them. There is no explanation why all of this favorable testimony was discounted and not considered.

■ Nevertheless, mindful of the discretion to be afforded the Parole Board and of the credibility determinations entrusted to the hearing officer, this Court characterized the decision as "debatable" but found that the marijuana possession did support the revocation of parole. Therefore the Appellate Division's affirmance of the Board's decision to revoke was not unreasonable. What *was* found unreasonable was the Appellate Division's affirmance of the Board's determination that the statutory guidelines provided a future eligibility term that was "clearly inappropriate" in relation to the severity and circumstances of the parole violation and the characteristics of the petitioner. Again, the unusual circumstances outlined here, which have become even more vivid as a result of discovery, have served to fortify this Court's decision that the Appellate Division's affirmance of the Board's arbitrary and capricious action in setting an FET outside the guidelines was unreasonable and in violation of petitioner's substantive due process rights. At most, the petitioner should have received a fifteen month FET, as discussed in the September 10, 1998 Order.[20] The decision that such a

---

**20.** In fact, as petitioner has pointed out, N.J. Stat. Ann. § 30:4–123.64(b) provides that "[n]o future parole eligibility date for a parole

violator returned to custody for reasons other than new criminal charges shall be set more

term was "clearly inappropriate" was based on an unreasonable interpretation of the facts from the entirety of the record. Thus, the Court turns to the remedy.

## II

Examples of unique circumstances discussed by the Third Circuit in *Gambino*, 134 F.3d at 164–65, which would allow a district court to order release on parole are: where a district court remands a case to the Parole Board for failure to adequately explain its decision, and the Board again declines to articulate a basis for the same result (citing *Bridge v. United States Parole Comm'n*, 981 F.2d 97, 106 (3d Cir. 1992); *Marshall v. Lansing*, 839 F.2d 933 (3d Cir.1988)), where there is non-compliance by a Parole Board after it was ordered to correct abuses or wrongful conduct within a fixed period of time (citing *Billiteri v. United States Board of Parole*, 541 F.2d 938, 944 (2d Cir.1976)), and where a prisoner was denied parole in part because of his race, and a remand would have consumed several months, by which time the sentence would have expired (citing *Block v. Potter*, 631 F.2d 233 (3d Cir. 1980)).

Recently, however, a trend has been emerging from the New Jersey courts advising that although the Parole Board has broad discretion, that discretion is not unlimited, and the courts may be more aggressive in fashioning a remedy to redress arbitrary or capricious decisions. In 2000, the Appellate Division found that the Pa-

role Board's decision to deny an inmate parole and establish an eighteen-month FET was not supported by substantial credible evidence, and held that the individual was entitled to immediate release. *Williams v. New Jersey State Parole Board*, 336 N.J.Super. 1, 763 A.2d 747 (App.Div.2000).

In *Williams*, the inmate was given a ten-year sentence. *Id.*, 763 A.2d at 750. Three years after his guilty plea, he was evaluated by a psychologist who concluded that he was an appropriate candidate for parole. *Id.* He was released on parole, but was arrested as a parole violator seventeen months later because he had failed to obtain approval for a change in his residence and employment, and was four days late in complying with the Megan's Law registration provisions. *Id.* A final revocation hearing was held, and the hearing officer recommended that the individual be continued on parole, even though a violation was found. *Id.*

The adult panel of the Parole Board rejected the hearing officer's recommendation that the individual be continued on parole, revoked parole, and set a twelve-month future eligibility term. *Id.* When the inmate came up for review, his eligibility for parole was deferred pending the completion of an in-depth psychological evaluation. *Id.* The psychologist concluded, "as long as Williams refuses to accept responsibility for his anti-social acts, he will be unable to progress in his rehabilitation and will remain a danger to society."

than one full year from the date of the parolee's return to custody." Further, the Court notes that subsection (a) of the referenced statute states that the schedule of future eligibility dates for parole violators shall be developed emphasizing *"the severity and circumstances of [the] parole violation* and on the characteristics of the parole violator." N.J. Stat. Ann. § 30:4–123.64(a) (emphasis added). Because petitioner had not been convicted of a crime, as provided for by N.J. Stat. Ann.

§ 30:4–123.60, but was actually convicted of a disorderly persons marijuana infraction, the Board's setting an FET beyond one year (or fifteen months, with the increase) is particularly offensive. *See Bonomo v. New Jersey State Parole Board*, 104 N.J.Super. 226, 249 A.2d 611, 615 (App.Div.1969) (parolee revoked based on disorderly conduct conviction cannot be found to have been revoked because of offense resulting in conviction of a crime).

*Id.* (This report did not mention the evaluation performed prior to Williams' parole. *Id.*) Williams received a hearing and was denied parole and instructed to try to get into a counseling and behavioral modification program. *Id.* The Board members cited the confidential professional report as mandating that they deny parole. *Id.* An eighteen-month FET was set. *Id.* at 750–51.

The Appellate Division found that the record did not contain sufficient credible evidence that Williams would commit another crime if released because of his successful seventeen months on parole. *Id.* at 751. The court found that the psychological evaluation was contradicted by the empirical evidence, and an insufficient basis on which to deny parole. *Id.* at 752. The Appellate Division stated that Williams was entitled to immediate release on parole, and remanded the case to the Parole Board to fix the terms and conditions of his release within twenty days of the date of the opinion. *Id.*

More recently, the New Jersey Supreme Court provided additional guidance when it remanded a matter to the Parole Board to set conditions of parole within twenty days upon finding that the Parole Board's denial of parole was not supported by a preponderance of the evidence in the record. *Trantino v. New Jersey State Parole Board*, 166 N.J. 113, 764 A.2d 940 (2001). Like *Williams*, the *Trantino* case is strikingly similar to the instant case, and the rationale used by the New Jersey Supreme Court in that case is instructive here.

Thomas Trantino was originally sentenced to death for the 1963 murder of a police officer in the line of duty. *Trantino*, 764 A.2d at 945–46. In 1972, the New Jersey Supreme Court concluded that a United States Supreme Court opinion effectively declared New Jersey's death penalty statute unconstitutional, and so Trantino's sentence was converted to life imprisonment. *Id.* at 946–47. The court noted that if sentenced under today's laws, Trantino would not have a possibility of parole. *Id.* at 945. Pursuant to the law in effect at the time of Trantino's sentencing, however, defendants sentenced to life imprisonment became eligible for parole after twenty-five years, less deductions for commutation time and good time credits. *Id.* at 947. Thus, Trantino first became eligible for parole in 1979. *Id.*

The Parole Board denied parole at that time, finding that the punitive aspect of his sentence had not been satisfied. *Id.* In 1980, however, Trantino was approved for parole subject to conditions, including intensive supervision and restitution to the victims' families in an amount to be fixed by the sentencing court. *Id.* The sentencing court declined to fix the restitution amount, and other issues were appealed, and the case was remanded to the Parole Board. *Id.* at 948. A new hearing on remand resulted in the Parole Board denying parole and fixing a ten-year FET, at the end of which time the punitive aspect of the sentence would be considered fulfilled, and Trantino would be presumptively eligible for parole. *Id.*

In 1988, a panel of the Board recommended parole release, but a majority of the full Board voted to deny parole and imposed a six-year FET based on Trantino's alleged unwillingness to participate in drug counseling or long-term psychotherapy. *Id.* at 949. In 1991, the Board again denied parole, concluding that Trantino had not achieved rehabilitation. *Id.* It recommended that the DOC place him in a halfway house for another opportunity to evaluate him, but the Superintendent at his prison denied the request. *Id.*

Later in 1992, when the Board had another opportunity to consider Trantino for parole, it deferred the decision until an in-

depth psychological evaluation could be held. *Id.* at 950. After a hearing in 1993, the two-member panel split, but ended up denying parole and imposing a thirty-six month FET, only because the DOC would not grant Trantino halfway house status. *Id.* The panel remarked that Trantino had reached his rehabilitative potential within the confines of prison. *Id.* at 950, n. 4. Although Trantino applied two more times for halfway house status, the requests were denied. *Id.* at 951. His 1994 application for parole was denied by a Notice of Decision dated April 17, 1995, and a three-year FET was imposed. *Id.* at 952. On April 26, 1995, the full Board denied Trantino's appeal, but vacated that decision on August 30, 1995 and set a new hearing date. *Id.*

On September 14, 1995, a hearing before a two-member panel culminated in a decision to refer the case to a three-member panel in order to set an FET greater than the presumptive thirty-six months, primarily based on Trantino's failure to remember certain aspects of the original crime, and the perceived lack of candor that resulted, leading the panel to believe there was a substantial likelihood that Trantino would commit a crime if released. *Id.* at 952–53. In April of 1996, the full Board voted to impose a ten-year future eligibility term. *Id.* at 953. A divided Appellate Division panel upheld the Board's denial of parole and decision to impose a ten-year FET, but remanded the matter to the DOC for consideration of an updated application for halfway house placement. *Id.* at 953. The New Jersey Supreme Court found that, indeed, the DOC's refusal to transfer Trantino to a halfway house was not supported by an adequate statement of reasons. *Id.* at 954. The court reversed the denial of parole and imposition of a ten-year FET and remanded the matter to the Parole Board for it to reconsider the evidence and redetermine Trantino's eligibility for parole. *Id.* at 953–54. The court

found Trantino's inability to remember details of the crime "consistent, longstanding, and genuine, and, beyond the issue of recollection, his acknowledgment of responsibility is sincere and legitimate." *Id.* at 955.

Trantino renewed his request for transfer to a halfway house in anticipation of his new parole hearing. *Id.* at 956. He was transferred to a residential treatment center for screening inmates prior to halfway-house assignment. *Id.* at 956. Immediately, however, numerous public officials protested the transfer and the governor requested review by the Attorney General. *Id.* The Attorney General's office arranged for a new psychological evaluation; the resulting report found that Trantino's risk of recidivism was low but that his prior history of substance abuse required participation in some sort of program. *Id.* Three days later, he was transferred back to a prison with the recommendation that he participate in substance abuse counseling, but was rejected for admission into the a program because his Addiction Severity Test score was below the minimum requirement. *Id.*

Subsequently, the Parole Board denied parole primarily on (1) concern with Ferguson's psychological evaluation, which led the Board members to conclude it was likely that Trantino would commit a new crime if released on parole, (2) the lack of a suitable parole plan, (3) failure to address in psychological counseling the issues that led to domestic violence against his first wife, thirty-eight years prior, and (4) Trantino's history of being less than candid with Board members and psychologists. *Id.* at 957. The New Jersey Supreme Court found that the evidence in the record was insufficient to support these various grounds for denial of parole. *Id.* at 986. Specifically, the court was concerned that the Parole Board seemed

to be abdicating its decision-making function to the psychologist in relying heavily on his report. *Id.* at 985. The court found that the Board's obligation was to render its decision not on the basis of the testimony of a single expert, or selected experts, but rather by application of the statutory criteria to all the evidence. *Id.* at 978 (citation omitted).

The court reiterated the controlling statutory standard that governs the Board's disposition:

> An adult inmate *shall be released* on parole at the time of parole eligibility, unless information supplied in the report filed pursuant to ... this act ... or developed or produced at a hearing ... indicates by a preponderance of the evidence that the inmate will commit a crime under the laws of this State if released on parole at such time.

*Id.* at 983 (citing N.J. Stat. Ann. § 30:4–123.53) (emphasis added). In turn, in determining the validity of the Board's denial of parole, the reviewing court must examine:

> (1) whether the agency's action violates express or implied legislative policy, i.e., did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

*Id.* at 976 (citing *Trantino v. New Jersey State Parole Board*, 154 N.J. 19, 711 A.2d 260 (1998)). The New Jersey Supreme Court made clear that the Parole Board " 'has broad but not unlimited discretionary powers,' and its determinations 'are always judicially reviewable for arbitrariness.' " *Trantino*, 764 A.2d at 976 (quoting *Monks v. New Jersey State Parole Board*, 58 N.J. 238, 277 A.2d 193 (1971)).

Most instructive is the New Jersey Supreme Court's rejection of the Parole Board's contention that "the actual granting or withholding of parole is a function reposing exclusively in the Parole Board." *Id.* at 977. The court's response was "Although the instances are few in which courts have found Parole Board decisions denying parole to be so arbitrary that affirmative judicial intervention to grant parole was necessary, that relief clearly may be encompassed within the province of judicial review." *Id.* (citing *Williams*, 336 N.J.Super. 1, 763 A.2d 747; *New Jersey State Parole Board v. Cestari*, 224 N.J.Super. 534, 540 A.2d 1334 (App.Div. 1988); *Mallamaci v. Dietz*, 146 N.J.Super. 15, 368 A.2d 947 (App.Div.1976)).

## III

Thus, it appears that a result other than remand is appropriate in light of the unique circumstances presented by this case. On September 10, 1998, this Court concluded that petitioner's substantive due process rights were violated because the Board's decision was arbitrary and capricious and not a reasonable determination of the evidence presented at the revocation hearing. The Court realizes that it would be desirable to allow the Board to correct the abuses and wrongful conduct visited upon petitioner. However, it does not see how that would be feasible, given the Board's arbitrary action after this Court's Order was released.

The November 30, 1998 Notice of Decision shows no · change from the earlier Notices of Decision and, in fact, may be more egregious. Even after this Court declared the five-year FET violative of petitioner's rights, the Board found it in its province to establish an eight-year FET even though circumstances had not changed. The policy behind setting an eight-year FET indicates that because the

Board does not think it would be reasonable to expect that parole would be granted for at least eight years, it will not spend its resources on this candidate for that length of time, but will concentrate on those cases with a good possibility of early release. *Garner v. Jones,* 529 U.S. 244, 254, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). As discussed in the September 10, 1998 Order, the entirety of the record in petitioner's case does not support such thinking.

The Court criticized the October 30, 1995 Hearing Summary and November 1, 1995 and January 26, 1996 Notices of Decision because the conclusion reached—that the guideline figure of a one-year FET with a possible upgrade to fifteen months was "clearly inappropriate"—was not supported by the evidence. The reasons advanced at that time and discredited by this Court were: petitioner's drug use and decades-old violence that led to his incarceration, the 1994 arrest for possession of marijuana, the DeFabio threats, and petitioner's presence at the April 1995 fund raiser. Apparently undeterred by this Court's ruling that a five-year period was improper under the circumstances, the same reasons were advanced in the November 30, 1998 Notice of Decision which arrogantly set an eight-year FET on top of the five-year term that petitioner served infraction-free.[21]

The November 30, 1998 Notice of Decision relied upon information contained in the pre-sentence report prepared almost thirty years ago to revisit, among other things, petitioner's past problems with drugs. Similarly, the decision recounted various offenses on petitioner's record from thirty years ago, and details of the original offense. As the New Jersey Supreme Court held in *Trantino,* the "reliance by the Board on evidence of such distant events can be understood only as a makeweight to overcome the lack of substantial evidence to support the Board's conclusions.... [T]he Board's emphasis on that evidence diminishes significantly the deference courts ordinarily accord to agency decisions." *Trantino,* 764 A.2d at 986.

Moreover, the New Jersey courts have instructed that under the Parole Act of 1979, the seriousness of the underlying crime may be considered only "as an element in determining whether the offender's punishment has been adequate to insure his individual progress toward rehabilitation." *New Jersey State Parole Board v. Cestari,* 224 N.J.Super. 534, 540 A.2d 1334, 1342 (App.Div.1988) (citing *In re Trantino Parole Application,* 89 N.J. 347, 446 A.2d 104, 109–110 (1982)). In July of 1992, petitioner was granted parole from a prison term imposed under Title 2A. At the time he was paroled, respondents were statutorily required to take into account and determine that petitioner had met the threshold requirement under 2A as having served the punitive aspect of his sentence. Even though petitioner is a technical parole violator, there is a vast difference between a technical parole violator and an inmate serving a life sentence for murder where a parole board has never made a determination as to the punitive aspect of the sentence being fulfilled.

The panel this time (November 1998) included the entire transcript of the second DeFabio call, stating that petitioner would have been revoked as a result of the calls if the Board had known about them sooner. As stated above, the Court is troubled by the Board's refusal to consider either that law enforcement did not consider petitioner's words to constitute threats at the

---

**21.** Additionally, the Board took from a 1991 psychological evaluation only negative aspects, but then conceded that petitioner was granted parole in 1992, *after* this evaluation.

time that they were expressed or that the threats had not been carried out in the almost three years that petitioner was on parole. The panel also revisited petitioner's transfer from Utah to Florida to New Jersey, conceding that the Office of Interstate Services approved the transfers, but characterized petitioner's action as "in violation of the Parole Act" because the Board was not aware of the transfers. (The Court notes that respondents' counsel conceded during oral argument that the transfer to Florida was not one of the factors validly relied upon by the Parole Board. (Tr. at 68.)) The panel then condemned petitioner for a return to drug use and association with motorcycle gangs.

The unique circumstance that arises is that these reasons were reviewed by this Court and rejected as inadequate to support a decision to depart from the presumptive term. The Board made a decision on November 30, 1998 as if this Court did not exist or had not spoken on any of these facts, and, more importantly, as though petitioner had not been paroled in 1992.

It is clear to this Court that this case presents unusual circumstances such that an ordinary remand to the Parole Board would prove inadequate and inappropriate. Indeed, one cannot avoid the appearance of vindictiveness that follows from seeing an eight-year FET imposed after petitioner received a favorable ruling that a five-year period, outside the presumptive term, was inappropriate. *See Marshall v. Lansing*, 839 F.2d 933, 947 (3d Cir.1987) (applying presumption of vindictiveness from *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), to actions of Parole Commission). Not unlike the cases cited in *Gambino*, the Parole Board did have an opportunity in this case to rectify the constitutional infirmities that this Court denounced in the September 10, 1998 Order. Instead of seizing that opportunity, the Board released a November 30, 1998 Notice of Decision indicating that it had no intention of complying with this Court's view of constitutional comportment.

IV

Respondents' newest rationale, that petitioner shows "no insight" into the psychological factors that caused his criminal behavior, is not supported by the record or an in-depth review of the psychological reports, and appears as an attempt to create a valid reason to keep petitioner incarcerated. Although, in granting the stay of the September 10, 1998 Order, the Court was concerned about the "danger to the public" interpretation raised by respondents, a thorough review of the case, including Ferguson's report, has assured the Court that such an interpretation is unfounded.

Moreover, on September 21, 1999, Clinical and Forensic Psychologist Dr. Gerald Cooke conducted an in-depth psychological evaluation of petitioner. Dr. Cooke's conclusions are positive, noting that petitioner spent approximately thirty-two months in the community without engaging in any anti-social or criminal behavior with the exception of smoking marijuana and exhibiting "questionable judgment arising from feeling that he had a responsibility to pay back a man who had contributed to his fund raiser by going to that man's fund raiser." Dr. Cooke also concurred with Dr. Ferguson in noting that from July of 1992 to June 15, 1995, petitioner was in the community for all but approximately three years. "During that time he did not act on that threat toward Mr. DeFabio or become involved in any other aggressive or criminal behavior, with the exception of possession of marijuana." Dr. Cooke opined that petitioner has "a very good potential to make a positive adjustment in the commu-

nity." In an addendum to his report, based on receiving an additional record of a November 2, 1991 psychological evaluation which found "no indication of unusual risk to re-offend," Dr. Cooke notes that petitioner "has matured further since 1991 and presents even less of a risk to act out or re-offend." [22]

Even without Dr. Cooke's evaluation to rebut any negative aspects of Dr. Ferguson's report, *Trantino* cautions that a "highly selective focus only on the psychological evidence supportive of its denial of parole, and its total disregard of evidence favorable to parole, undermines the deference that a court ordinarily would confer on an agency determination." *Trantino*, 764 A.2d at 985. Like Trantino, this petitioner has acknowledged his crime and has accepted responsibility for his actions in numerous parole hearings and psychological evaluations. The record does not provide an adequate basis for the Board's conclusion that petitioner has "no insight" into his reasons for associating with motorcycle club members in light of the report of the Board's own psychologist outlining the reasons why the motorcycle club made petitioner feel accepted so many years ago, and the reason for his more recent attendance at a motorcycle club member fund raiser.

Indeed, petitioner's case mirrors another case in which the Appellate Division determined that the Parole Board read more into a doctor's solitary negative eval-

uation than is actually stated in the report. In *Cestari*, the court stated:

> Dr. Rotgers only concluded that "Mr. Cestari must still be considered to have the potential to become involved in a violent incident in the future." Rotgers' opinion that Cestari has "the potential to become involved in a violent incident" does not mean that there is a "substantial likelihood" he will commit another crime. Indeed, it could be accurately said that nearly all violent offenders, and many persons who have never been convicted of violent offenses, have the "potential" to become involved in a violent incident. It is only when that "potential" rises to the level of a "substantial likelihood" that another crime will be committed that parole may be denied.

*Cestari*, 540 A.2d at 1343. In petitioner's case, as stated above, although respondents have relied upon Dr. Ferguson's report to deny parole and set an eight-year FET, they have read more into his evaluation that is actually stated. Yet again, there arises an inference that respondents will do whatever it takes to keep petitioner incarcerated, whether or not the record actually supports their determinations.[23] The Court finds such conduct to constitute unusual circumstances.

## V

In summary, after much protracted litigation, the Court is of the opinion that the Parole Board continues to make inappropriate findings where petitioner is con-

---

22. Even when repeatedly reminded by the Court during oral argument that Dr. Cooke's report—ordered and paid for by this Court—has never been responded to, respondents still have nothing to say, somewhat reminiscent of the nonresponsiveness the Court encountered from the respondents from the outset of the case.

23. As a final example, the Board also cites petitioner's "institutional behavior" as sup-

porting an eight-year FET. The only negative circumstance outlined by the November 30, 1998 Decision was that petitioner became "confrontational" with Board members, asserting that holding the October 21, 1998 hearing was improper in light of this Court's September 10, 1998 Order, which the panel refused to acknowledge. This is not the type of "institutional behavior" that would support such a severe determination.

cerned, and the Board has exhibited such an appearance of vindictiveness, that the ordinary remedy of remanding this matter for a new FET, or even for immediate consideration of whether to parole petitioner, would prove inadequate and inappropriate. This Court found, in September of 1998, that the Parole Board's arbitrariness was to such a degree that it effected a violation of petitioner's substantive due process rights. After this Court's decision was released, the Parole Board denied petitioner's statutory right to a continuance of his parole hearing, and imposed a more egregious future eligibility term than the one this Court condemned. The Board's own actions make it clear that a remand cannot work in this case. The Board has continued to make decisions not based upon the preponderance of all of the evidence, but on the Board's selective reliance only on limited testimony that still does not support a denial of parole and an imposition of a future eligibility term outside the guidelines. Such selectiveness undermines the deference to which the Parole Board's decision ordinarily would be entitled. *See Trantino*, 764 A.2d at 945.

The Board's November 30, 1998 denial of parole and imposition of an eight-year FET was not supported by the evidence. According to his parole officers, petitioner was a successful parolee, absent the one drug arrest, yet the November 30, 1998 Notice of Decision does not even mention the almost three-year period that petitioner successfully spent on parole and in the community as a homeowner, gainfully employed, with a stable support system. Moreover, there is absolutely no evidence of institutional infractions since the time of petitioner's revocation. There simply is no support for the Board's finding that petitioner is substantially likely to commit another crime if released on parole. Thus,

the Board's November, 1998 action reflects a clear abuse of discretion in view of this Court's specific earlier holding that a future eligibility term outside the guidelines was inappropriate in petitioner's case.

The Court is convinced, therefore, that trusting the Parole Board to reevaluate its decision will result only in this petitioner spending years more in jail while again exhausting his state remedies to get back to this very point. He has already served *six years* in prison for violating the conditions of his parole by possessing marijuana. As pointed out during oral argument, he received an eight-year future eligibility term consecutive to a five-year future eligibility term, yielding thirteen years because he possessed marijuana. It would be futile to remand this case to request that respondents give petitioner reasonable consideration. That normal process has been obviated because of respondents' action of imposing an eight-year FET consecutive to the five-year FET in the very midst of what this Court was attempting to resolve without a complete record from the State. (Tr. at 61.)

On September 10, 1998, this Court declared that the nearly four years served at that point was "far more than the maximum time he should have received." Two and one-half years later,[24] the Court is even more convinced that the only appropriate remedy in this case is immediate release on parole.

In ordering such release, the Court will allow the Parole Board to set the terms and conditions of petitioner's parole, but will hold the Board to the affidavits submitted to this Court in which respondents agree Mario Paparozzi, Rachel Chowaniec, Rolando Gomez–Rivera, and Ruby Washington are not to have any involvement in

---

**24.** As petitioner's counsel stated during oral argument, perhaps the best evidence of the

violation of petitioner's rights is the fact that he is still in prison.

any determination regarding petitioner's case; they shall not.

### III. CONCLUSION

The Court is well aware of its obligation to afford proper discretion to the Parole Board. However, it is also aware of its responsibility "to insure that the Board has followed criteria appropriate, rational and consistent with the statute and that its decision is not arbitrary and capricious, nor based on impermissible considerations." *Zannino v. Arnold*, 531 F.2d 687, 690 (3d Cir.1976). In doing so, the Court has followed the Third Circuit's direction that it may be necessary to look behind the reasons that are stated in the notice of decision to ensure that due process has been observed. *See id.* This Court determined on September 10, 1998 that there was no rational basis in the record for the Board's imposition of a five-year FET, well beyond the presumptive term. The record developed as a result of court-authorized discovery supports petitioner's contention that the Parole Board's determination was not based on a preponderance of evidence presented, but was grounded only on selective, arbitrarily chosen portions of the record, with utter disregard for the substantial evidence favorable to petitioner, not the least of which was petitioner's demonstrated success on parole. The Court is aware that the Appellate Division did not have the benefit of the recent discovery when it affirmed the Board's decision. Nevertheless, the reasons advanced by the Board for its decision to impose a five-year FET fail because they are not in keeping with current New Jersey law; the severity of the violations does not warrant an FET above the presumptive term. Thus, even on the record available at the time of this Court's original Order, the Appellate Division's affirmance of the Board's actions was unreasonable because the Board's decision to impose such a harsh term in this case was arbitrary and capricious.

Although the Court announced this finding two and one-half years ago, the Parole Board has continued to violate petitioner's rights; the record overwhelmingly demonstrates the arbitrariness and unreasonableness of the Board's decisions after this Court spoke on September 10, 1998 on the issue of a future eligibility date beyond the guidelines. The Parole Board continues to construct artificial factors to deny parole, such as petitioner's having "no insight" into psychological aspects of his actions, although such factors did not stand in the way of the Board granting him parole in 1992 and did not cause revocation at any time, as the revocation was based on petitioner's marijuana arrest. Therefore, this Court finds that there are such unusual circumstances present in this case that remanding it to the Parole Board to impose a new future eligibility term or consider petitioner as a candidate for parole would be futile.

The seriousness of the nature of petitioner's original crime is not lost on this Court. Without a law on the books, however, which imposes a life sentence without the possibility of parole for petitioner, respondents cannot arbitrarily give him a "constructive" life sentence by continuing to "move the goal post" without support for their actions. Again, the Court finds that the over-six years served by petitioner following his parole revocation is far more than the maximum time he should have received. Therefore, due to the unique circumstances present in this case, the only appropriate remedy is immediate release on parole.

An accompanying Order will issue this date.

### ORDER

This matter having come before the Court as a result of simultaneous briefing by the parties on the limited issue of the

appropriate remedy to be afforded petitioner; and

This Court having granted the writ of habeas corpus on September 10, 1998 and having ordered petitioner's immediate release; and

This Court further having granted respondents' motion for reconsideration on June 10, 1999, expressly stating that reconsideration was granted in light of "controlling decisions of law which hold that the proper remedy in a situation such as this one would have been something other than ordering petitioner's release"; and

The Court finding that *Gambino v. Morris,* 134 F.3d 156 (3d Cir.1998), instructs that absent unusual circumstances, a remand to the Parole Board, or something other than immediate parole release, is the appropriate remedy to be afforded a petitioner who succeeds in obtaining a writ of habeas corpus; but

The Court further finding, in light of the current state of the record as developed through recent discovery, that this case does present the type of unusual circumstances that would make the ordinary remedy of a remand to the Parole Board inadequate and inappropriate; and

For the reasons expressed in the accompanying opinion and on the record during oral argument on February 2, 2001,

IT IS ORDERED on this *16th* day of March, 2001 that petitioner is entitled to immediate release on parole; the case is remanded to the Parole Board to set the conditions of petitioner's release in keeping with New Jersey law and the accompanying Opinion. The remand proceedings are to be completed within twenty days of the date of this decision, or by April 5, 2001.

IT IS FURTHER ORDERED that respondents' Motion to Dismiss the Petition [89] is hereby *DENIED.*