

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-2002

# Hunterson v. DiSabato

Precedential or Non-Precedential: Precedential

Docket No. 01-1805

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Hunterson v. DiSabato" (2002). *2002 Decisions.* Paper 644.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/644

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

     Filed October 10, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1805

NEIL HUNTERSON

v.

MARY KEATING DISABATO, Chairman, N.J. State Parole
BD.; MICHAEL R. MCKEEN, Administrator, S.S.C.F.; THE
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY,
PETER VERNIERO,
        Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 98-cv-00482)
District Judge: Honorable Joseph H. Rodriguez

Argued January 7, 2002

Before: MANSMANN,* RENDELL and FUENTES, Circuit  Judges

Reargued May 2, 2002

Before: RENDELL, FUENTES and COWEN, Circuit Ju dges

(Filed October 10, 2002)
_____

* Hon. Carol Los Mansmann, Judge of the United States Court of
Appeals for the Third Circuit, died on March 9, 2002.


        James D. Harris, Esq. [ARGUED]
        Office of Attorney General of
         New Jersey
        Division of Law
        25 Market Street
        Trenton, NJ 08625
         Counsel for Appellants

        John S. Furlong, Esq. [ARGUED]
        Furlong & Krasny
        820 Bear Tavern Road
        Mountain View Office Park,
         Suite 304
        West Trenton, NJ 08626
         Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

Neil Hunterson was convicted of first-degree murder and

kidnaping in 1972. He was sentenced to two life terms of imprisonment. In July 1992, he was paroled. His parole was revoked on November 1, 1995,[1] and a five-year future eligibility term ("FET") was imposed. Hunterson has been challenging the revocation of his parole and the imposition of the five-year FET ever since, claiming that it was not based on any "danger to society" he posed, but instead was a result of the New Jersey Parole Board's animus toward him.

After exhausting his appeals in the New Jersey court system, Hunterson filed a petition for a writ of habeas corpus in the United States District Court for the District of New Jersey. In his petition, Hunterson alleged a wide-range of constitutional violations, and a conspiracy to violate his rights, by a variety of state actors, including various individuals, the Parole Board, and the New Jersey Supreme Court.

_____

1. He had been detained since June 15, 1995.

The District Court granted the petition, concluding that Hunterson's substantive due process rights were violated. Hunterson v. DiSabato, 137 F. Supp. 2d 529 (D.N.J. 2001) (Hunterson I). The Court thereafter issued a second opinion focusing only on the remedy. Hunterson v. DiSabato, 140 F. Supp. 2d 353 (D.N.J. 2001) (Hunterson II). In this later opinion, the Court addressed the alleged conspiracy against Hunterson, concluding that the circumstances of the case were so unusual that release was the only appropriate remedy. Id. at 380, 382. The District Court accordingly ordered his release on March 16, 2001.

The government respondents, Mary Keating DiSabato, Chairperson, New Jersey State Parole Board ("Board" or "Parole Board"), and Michael R. McKeen, Administrator, Southern State Correctional Facility, now appeal. As we conclude that the District Court did not conduct its review of the Parole Board's decision and the state appellate court's affirmance of it in accordance with the constraints of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we will reverse and remand to the District Court to consider the remaining claims presented in Hunterson's habeas petition.[2]

I. FACTS

This case comes to us with a complex procedural history presenting the matter in an unusual posture. Not only were there numerous appeals within the state system, and subsequent affirmances and reversals, but there were also two separate opinions issued by the District Court-- first granting the writ and thereafter ordering Hunterson's release. In its two published opinions the District Court set forth the underlying proceedings in great detail and we will not restate them here. Instead, we will set forth only those

facts necessary to our analysis.

In 1972, Hunterson, then president of the Henchmen motorcycle gang, was convicted of the kidnaping and first-

_____

2. As we discuss below, the reversal of the District Court's release order will result in the immediate return of Hunterson to confinement. However, further proceedings regarding his additional claims, if still viable, should occur forthwith.

degree murder of a rival motorcycle gang member. He was sentenced to two life terms. After serving approximately twenty years of his sentence, he was paroled on July 29, 1992. The current controversy involving the revocation of his parole had its origins on September 29, 1994, when Hunterson was arrested and charged with possession of marijuana and possession with intent to distribute approximately 50 grams of marijuana. The distribution charge was subsequently dropped, and Hunterson pled guilty to a disorderly persons offense for possession of less than fifty grams of marijuana.

Four additional facts are especially important since they were repeatedly relied upon in the course of the revocation proceedings, and have been consistently challenged by Hunterson as insignificant or improperly considered. On July 9, 1992, while still incarcerated and in New Jersey for a parole hearing, Hunterson allegedly threatened Ralph DeFabio, another former biker gang member, over the telephone. On August 5, 1992, less than a week after his release on parole, he again called DeFabio and made arguably threatening comments. This conversation was recorded by DeFabio.[3] On April 21, 1995, Hunterson attended a fundraiser for a member of a motorcycle gang known as "the Egyptian." Finally, Hunterson admitted to his parole officer that he had been using marijuana. [4]

Central to Hunterson's claims is his view that his romantic relationship with Deborah Hansen caused the Parole Board to be biased against him in the state revocation proceedings. When Hunterson and Hansen began dating, she was the Deputy Director of Interstate Parole Services for New Jersey. Hunterson claims that his

_____

3. The transcribed conversation is included in the Board's September 9, 1998 decision. The verbal altercation appears to be about a car Hunterson believes DeFabio took from him, as well as DeFabio's role in his being arrested for the murder twenty years earlier. At one point Hunterson says: "I'll come to your house with your family, fuck you, your kids and your mother, punk."

4. In her testimony, Elaine Torres, one of Hunterson's parole officers, explained that Hunterson had admitted his marijuana use, and she had thought it was understandable given the stressors in his life, including his mother's serious illness.

relationship with Hansen, who during this time became his fiancee, was the real motivation for the Parole Board's actions. During their relationship, and around the time of Hunterson's marijuana arrest, Ms. Hansen was a vocal critic of the Department of Corrections. Specifically, Ms. Hansen publicly criticized the department's mishandling of interstate parole, illustrated by the murder committed by one interstate parolee, Robert "Mudman" Simon. After William Fauver, the Corrections Commissioner at the time, testified before a state senate subcommittee, Hunterson and Hansen held an impromptu news conference attacking the accuracy of his testimony.

As a result of Hunterson's marijuana arrest and urine tests showing signs of drug use (which were eventually deemed inadmissible because of problems with the chain of custody), parole revocation proceedings were undertaken. New Jersey law provides that "[a]ny parolee who has seriously or persistently violated the conditions of his parole, may have his parole revoked and may be returned to custody . . . ." N.J.S.A. 30:4-123.60. According to the New Jersey Supreme Court, the proper consideration in parole proceedings is whether the individual is likely to engage in further criminal activity. Trantino v. New Jersey State Parole Bd., 711 A.2d 260, 270 (N.J. 1998)[Trantino VI]. The New Jersey Administrative Code sets forth the factors to be considered at parole hearings. N.J.A.C. 10A:71-3.11. First, it explains that "[p]arole decisions shall be based on the aggregate of all pertinent factors." N.J.A.C. 10A:71-3.11(a). It provides a list of twenty-three factors that should be considered, including, the nature and pattern of previous convictions, adjustment to parole, facts and circumstances of the offense, aggravating and mitigating factors surrounding the offense, parole plans and the investigation thereof, and status of family or marital relationship. N.J.A.C. 10A:71-3.11(b). It also provides that the Board "may consider any other factors deemed relevant." N.J.A.C. 10A:71-3.11(b).

After a series of hearings and apparent procedural errors by the Board (reversed by the New Jersey appellate courts), a two-member panel of the Board revoked Hunterson's parole in November 1995, stating:

> His behavior in [respect to his marijuana possession] projects a troubling immaturity of judgment, as well as an inability to abide by limitations imposed by administrative and statutory authority. When coupled with the threats to DeFabio, the admitted marijuana use and his presence at the April 1995 Pagan benefit, there begins to emerge the profile of an individual constitutionally incapable of adopting a manner of living which requires strict adherence to the rules of

        society.

The panel then had the duty of setting a FET, providing the
next date when he would be eligible for parole.

Under New Jersey law, the presumptive future eligibility
term for Hunterson's parole was twelve months, subject to
a three-month increase if the panel determined "the
circumstances of the parole violation and the
characteristics and past record of the parolee warrant such
adjustment." N.J.A.C. 10A:71-7.17( b) and (c). However, the
state administrative code provides that if the two-member
panel found that this term was "clearly inappropriate . . .
the two-member Board panel shall refer such case for a
three-member Board panel review for the purpose of
establishing a future parole eligibility date." N.J.A.C.
10A:71-7.17(p). The two-member panel concluded that the
presumptive twelve-month term, or even the fifteen-month
term, was inappropriate and therefore referred the case to
a three-member panel. Based largely on the issues noted by
the two-member panel, as well as the conviction underlying
his parole and history of alcohol and drug use, the three-
member panel concluded that "public safety requires that a
substantial parole eligibility term be imposed" and
established a five-year FET.[5]

_____

5. As with other sentences, the FET period can be shortened by certain
credits. For example, Hunterson actually received a hearing for parole on
February 13, 1998, only 2-1/2 years into his five-year FET. However,
Hunterson was denied parole, and on November 30, 1998, a three-
member panel of the Parole Board determined that an eight-year FET
was appropriate in his case because he had "never seriously addressed
in counseling session issues such as why [he had] in the past reflected
a need to associate with individuals involved in criminal activity and the

Throughout these proceedings, Hunterson has sought
release -- initially appealing the various decisions of
hearing officers and the New Jersey State Parole Board, and
eventually filing a petition for a writ of habeas corpus in
federal court.

On appeal, the Superior Court of New Jersey Appellate
Division ("Appellate Division"), the state court that hears
direct appeals from the Parole Board, ruled repeatedly in
Hunterson's favor and reversed or vacated the Parole
Board's decisions based on various defects in the
proceedings. First, on November 2, 1994, the Appellate
Division reversed the original finding of probable cause for
the parole violator warrant: "In view of the State's
representation that it cannot establish the chain of custody
of the three urine tests, the finding of probable cause of
October 21, 1994 is reversed." Second, on December 27,
1994, the Appellate Division vacated the parole violator
warrant for the drug charges: "The issuance of the parole
warrant is summarily reversed. The warrant is vacated.
Defendant may be released. The Board may continue

statutorily authorized parole revocation proceedings." Third, on June 20, 1995, the Appellate Division vacated the parole violator warrant for lack of probable cause and ordered Hunterson released. In its strongest criticism of the Parole Board, the Appellate Division found the revocation procedure employed by the Board to be procedurally and substantively flawed:

> The procedures set forth in N.J.S.A. 30:4-123.60 and N.J.A.C. 10A:71-7.3 were not followed by the parole authorities in this case. As a result, a warrant was issued and Hunterson was returned to jail without the required findings that the charge against him is serious and that he poses a danger to the public safety.

_____

causes of [his] substance abuse problem." This eight-year FET is not before us on appeal, nor was it before the District Court when it issued its original order granting the writ. During oral argument, Appellants' counsel indicated that if we were to reverse the District Court, it would not enforce the eight-year FET, and the Parole Board would immediately hold a new hearing and would exclude members previously involved in the case.

7

> Hunterson is charged with a fourth-degree possessory drug offense. In light of the fact that he was arrested on this charge over nine months ago and the parole warrant did not issue until June 15, 1995, it is obvious that no emergency justifying departure from the mandatory statutory and regulatory procedures exists. The June 15 warrant is vacated. Hunterson is to be released immediately. Nothing in this order precludes the parole authorities from continuing parole revocation procedures against Hunterson in accordance with [the] law.

The New Jersey Supreme Court stayed the release order. Fourth, on July 24, 1995, the Appellate Division ordered Hunterson released pending a final decision of the Parole Board. The New Jersey Supreme Court reversed the July 1995 order that directed the immediate release of Hunterson and directed that parole revocation proceedings should be commenced immediately.

The Appellate Division's final decision in this case-- and the ruling that is urged by Hunterson to be flawed-- was its review on direct appeal of the imposition by the Parole Board of the five-year FET.6 The court affirmed the Parole Board's decision. Hunterson's brief alleged a wide range of violations of his rights, and generally argued that his parole had been revoked and a five-year FET imposed not because of his prior crimes and later conduct, but because of his relationship with Ms. Hansen. He claimed that the Board's ruling was motivated by bias against him, and that its actions were arbitrary, capricious, retaliatory, and violative of fundamental fairness under, inter alia, the due process clause of the Fourteenth Amendment. The Appellate

Division specifically recounted all of the arguments made by Hunterson in his original and amended briefs (sixteen in number), reviewed Hunterson's post-release conduct, and determined that it would not disturb the Parole Board's ruling:

> Thereafter, he returned to his errant ways through
> continued drug abuse; association with motorcycle

_____

6. The New Jersey Supreme Court denied certification on January 15, 1998.

> gang members; and threats, ten years after the fact, against a person he apparently believed was responsible for connecting him to the original murder. This is a shocking turn of events and Hunterson's insistence on characterizing the case as one involving conviction for a disorderly persons offense simply misconceives the nature and import of his problematic conduct. Standing alone, the disorderly persons offense (which does not qualify as criminal conduct) could have subjected Hunterson to a one year FET with a possible upgrade to 15 months at the hands of a two member panel. N.J.S.A. 30:123:64(b); N.J.A.C. 10A:71-7.16(b)(4). Referral to the three member panel was based on the two member panel's conclusion that the guideline figure was clearly inappropriate. Given that immediately upon parole, Hunterson fell back into the type of conduct which led to his initial convictions for serious crimes, we cannot say that the parole revocation and the five year FET set by the three member panel and approved by the Board was arbitrary or lacked inherently credible supporting evidence.

## II. FEDERAL COURT PETITION

Hunterson filed his writ of habeas corpus in the United States District Court for the District of New Jersey in February 1998. The pro se petition alleged a number of violations of his constitutional rights, and generally accused the Parole Board of being involved in a vast and complex conspiracy in an effort to return Hunterson to prison. Most of Hunterson's petition is dedicated largely to recitations of facts and allegations of corruption, with little in the way of explication of the claims in legal terms. According to Hunterson, the Parole Board was motivated not by a concern that Hunterson posed a danger to society, but by its anger at Hunterson and his fiancee, Deborah Hansen, for exposing the improper activities of the New Jersey Department of Corrections and the Parole Board.

Hunterson claims that the Parole Board's actions violated his federal constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. The petition does not make clear precisely how he believes that

each of these rights was violated. In several instances he simply says that the hearings were held without his being afforded constitutional protections, or he asserts in conclusory fashion that an individual's action was "unconstitutional." Of course, as this is a pro se petition, we will construe it liberally. See, e.g., United States v. Garth, 188 F.3d 99, 108 (3d Cir. 1999) (providing that we use a "more forgiving lens . . . to construe pro se habeas petitions"). Among his more specific allegations, Hunterson claims:

>1) His First Amendment rights were violated because he was incarcerated as punishment for speaking out publicly against the Department of Corrections and Parole Board.
>
>2) The New Jersey Supreme Court violated his Fourteenth Amendment rights to due process and equal protection each time it reversed the Appellate Division.
>
>3) Referral to the three-member panel was based on an unconstitutional hearing.
>
>4) The five-year FET was excessive and violated the Eighth and Fourteenth Amendments.
>
>5) The Board's subsequent confirmation of the five-year FET violated his Fourteenth Amendment rights and his Eighth Amendment protections against cruel and unusual punishment.
>
>6) His September 29, 1995 hearing was not conducted before an impartial hearing officer in violation of his due process and equal protection rights.

He further claims his constitutional rights were specifically violated during the September 1995 hearing in five ways:

>1) reliance on a three-year-old threat;
>
>2) witness (DeFabio) was not produced, and therefore his procedural due process rights were violated;
>
>3) hearsay and vouching violated his due process and equal protection rights;

>4) use of urine tests, ruled inadmissible by the Appellate Division, during questioning of witnesses, violated his Fifth, Sixth, and Fourteenth Amendment rights; and,

5) the Special Prosecutor removed all mitigating files in an effort to prejudice the hearing's outcome in violation of his Fourteenth Amendment rights.

The District Court had jurisdiction pursuant to 28 U.S.C. S 1343. We have jurisdiction under 28 U.S.C.SS 1291 and 2253. No certificate of appealability is required for the state to appeal the District Court's order. Fed. R. App. P. 22(b)(3). And, "[b]ecause the District Court relied exclusively on the state court record and did not hold an evidentiary hearing, our review of its decision is plenary."[7] Moore v. Morton, 255 F.3d 95, 103 (3d Cir. 2001).

III. DISCUSSION

The District Court acknowledged that its review was governed by the standards set forth in AEDPA. Hunterson I, 137 F. Supp. 2d at 541. It concluded that Hunterson's substantive due process rights had been violated because the "Appellate Division's affirmance of the Board's decision to impose a five-year FET was unreasonable," id. at 546, and that "[t]he decision to impose the five year term was arbitrary and capricious, and a clear abuse of discretion." Id. at 545 (emphasis added). The District Court also found that the state courts had made an unreasonable determination of facts because "petitioner's substantive due process rights were violated because the Board's decision was arbitrary and capricious and not a reasonable determination of the evidence presented at the revocation hearing." Hunterson II, 140 F. Supp. 2d at 378. The District

_____

7. In this case, the District Court held an evidentiary hearing, but only in connection with the remedy after it had ruled on the merits of the petition. Therefore, as that evidence was not used for the purpose of granting the petition, we will conduct our review as if the hearing had not been held. If the District Court had held an evidentiary hearing upon which its decision was based, we would still conduct a plenary review of the District Court's legal conclusion but review its factual conclusions for clear error. Stevens v. Delaware Corr. Ctr. , 295 F.3d 361, 368 (3d Cir. 2002).

11

Court did not detail precisely how it reached either of these conclusions, but it is clear that it believed the five-year FET was not justified and that the state court should have found that bias was at the heart of the Board's ruling.[8]

While one might second-guess the Parole Board's decision, and state court's approval of it, it is not the role of the federal courts to do so. Our review, and that of the District Court, is quite distinct from that of the state appellate courts. The Supreme Court has explained that because our review on habeas is collateral, and not supervisory, "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' " Donnelly v.

DeChristoforo, 416 U.S. 637, 642 (1974) (citation omitted).

_____

8. The District Court reasoned as follows at various junctures in its two opinions: "From the time of Petitioner's initial arrest on September 29, 1994 for what ultimately turned out to be a disorderly persons marijuana possession, it is evident that the parole authorities have put forth a great deal of effort to see him imprisoned for a substantial and disproportionate period of time." Hunterson I , 137 F. Supp. 2d at 546-47. "The Petitioner's final accelerated parole revocation hearing (filed on an accelerated basis even though it was not conducted until September 29, 1995, exactly one year after his initial arrest) was similarly injected with the bias." Id. at 547. "Petitioner presented a considerable amount of evidence that tended to show that the parole authorities were impermissibly motivated by many external factors. Their motivations, however, are not important to the analysis, which focuses on their conduct." Id. at 547 n.25. In concluding its second opinion, which focused on the remedy, the Court explained:

> The Court is aware that the Appellate Division did not have the
> benefit of the recent discovery when it affirmed the Board's decision.
> Nevertheless, the reasons advanced by the Board for its decision to
> impose a five-year FET fail because they are not in keeping with
> current New Jersey law; the severity of the violations does not
> warrant an FET above the presumptive term. Thus, even on the
> record available at the time of this Court's original Order, the
> Appellate Division's affirmance of the Board's actions was
> unreasonable because the Board's decision to impose such a harsh
> term in this case was arbitrary and capricious.

Hunterston II, 140 F. Supp. 2d at 383.

12

Additionally, federal court review in this case is strictly limited by AEDPA, as Hunterson filed his petition after its enactment. AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf
> of a person in custody pursuant to the judgment of a
> State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim-- (1)
> resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of
> the United States; or (2) resulted in a decision that was
> based on an unreasonable determination of the facts in
> light of the evidence presented in the State court
> proceeding.

28 U.S.C. S 2254(d)(1)-(2).9 Therefore, the considerations under AEDPA are divided into an examination of the legal analysis and a separate consideration of the factual determinations.

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained in detail the proper means by which a federal court is to undertake a review of the state court's

However, if an issue presented to the state court was not "adjudicated on the merits," we conduct a pre-AEDPA de novo review. Everett v. Beard, 290 F.3d 500, 507-08 (3d Cir. 2002). In this case, the District Court explicitly stated that its review was governed by AEDPA, and it never suggested that this argument was not adjudicated on the merits below. Hunterson argues on appeal, in the alternative, that his substantive due process claim was not adjudicated, as he "attempted to raise the issue of bias and conspiracy in the state proceedings but was not permitted to do so." We disagree. In this case, the same arguments regarding bias and illicit motives were presented to the Appellate Division as were made before the District Court. The Appellate Division considered the merits of Hunterson's claims and did not fault the Parole Board's refusal to hear evidence in this regard. The court measured them against a standard that was consistent with federal law and found that the allegations of bias would not have affected the outcome. See Marshall v. Hendricks, No. 00-9004, ___ F.3d ___, 2002 WL 31018600, at *69 n.18 (3d Cir. Sept. 11, 2002) (stating that, in Everett, the state court decision was not analyzed under the AEDPA standard of review because the court had applied the incorrect legal standard under federal law).

13

legal analysis. First, the "contrary to" provision is only implicated if the state court "applies a rule that contradicts the governing law set forth" by the Supreme Court or if it arrives at a different result when confronted by"facts that are materially indistinguishable" from those previously before the Supreme Court. Id. at 405-06 (O'Connor, J., concurring) (controlling opinion). Hunterson does not argue that the state court's analysis was "contrary to" federal law, but instead claims that it was an unreasonable application of federal law. In Hameen v. State of Delaware , quoting Williams, we explained: "[U]nder the 'unreasonable application' clause, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " 212 F.3d 226, 235 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001) (quoting Williams, 529 U.S. at 411).

In contrast, the unreasonable determination of the facts standard is a somewhat less amorphous standard. Adhering to the words of the statute, federal court review considers only whether the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. S 2254(d)(2). The statute directs the federal court to presume that all determinations of fact made by the state court are correct and requires that the petitioner present "clear and convincing evidence" to rebut this presumption. 28 U.S.C. S 2254(e)(1); see also Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 368 (3d Cir. 2002).

It is clear that the Appellate Division considered all of

Hunterson's claims, most of which emphasized his view that the Parole Board was improperly motivated to prevent his early release. While his pro se submissions did not allege chapter and verse of the applicable constitutional principles, they clearly urged due process violations, substantive and procedural, focusing principally on "arbitrary" and retaliatory rulings by the Parole Board. And, the Appellate Division just as clearly considered these

14

claims, concluding that the Parole Board's determinations were well-founded and not arbitrary. While the Appellate Division's ruling was somewhat conclusory and did not analyze Hunterson's claims or relate them to specific Supreme Court precedent, it is, nonetheless, apparent that Hunterson's claims were adjudicated on the merits. We have recently noted that such summary adjudications are to be subjected to the AEDPA standard of review under S 2254(d). Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002).

However, reading the District Court opinion, we are compelled to conclude that it skewed the analysis under the AEDPA standard, and that its conclusion that the writ should be granted was based not on the analysis dictated under Williams, but, essentially, on its sincere disagreement with the ruling of the Parole Board. It is important to note at the outset that neither Hunterson nor the District Court focuses on any specific facts that demonstrate either that the FET was out of line with other FETs meted out to persons previously convicted of similar offenses, or that the Parole Board acted out of bias rather than based on evidence regarding Hunterson's crime and problematic conduct. Nor can we find in the record a "smoking gun," let alone any probative facts that would warrant our grant of the writ under the applicable standard. In view of the state of the record, neither the District Court's analysis, nor its ruling that Hunterson is entitled to release, can pass muster.

1. Unreasonable Application of the Law

There is no question in this case that Hunterson's possession of marijuana violated the terms of his parole and therefore provided a basis for revocation. Hunterson's substantive due process argument accordingly challenges not the revocation itself, but, rather, the period of time Hunterson was to be incarcerated before being eligible for parole -- the FET. His argument, therefore, is that the imposition of the five-year FET violates substantive due process. But this type of constitutional challenge to a state court proceeding is not easily mounted. We have made clear that the federal courts, on habeas review, are not to "second-guess parole boards," and the requirements of

15

substantive due process are met if there is some basis for the challenged decision." Coady v. Vaughn, 251 F.3d 480, 487 (3d Cir. 2001).

At oral argument, Hunterson's attorney conceded that, based on Hunterson's conduct, imposition of the five-year term alone is not so great a departure that it would amount to a violation of his constitutional rights, but, rather, it is the presence of the alleged bias that raises it to that level. The relevant level of arbitrariness required in order to find a substantive due process violation involves not merely action that is unreasonable, but, rather, something more egregious, which we have termed at times "conscience shocking" or "deliberately indifferent." 10

We agree that the mere length of the FET is not so egregious, since, after all, Hunterson is a convicted kidnaper and murderer who was sentenced to two life

---

10. At times our court has confronted the applicable standard with some level of uncertainty regarding its precise formulation. See, e.g., Ziccardi v. City of Philadelphia, 288 F.3d 57, 64 (3d Cir. 2002) (noting that the issue of the "intent needed to support a substantive due process claim is a question that has long troubled our court."). The issue has arisen most often in connection with civil suits underS 1983, and we therefore face a somewhat different application here. We do not and need not hold precisely which terminology is most apt, however, as we find in any event that the District Court applied a less egregious standard than is required for a substantive due process violation. We do note that we have frequently employed the "shocks the conscience" standard when considering a claim that an executive action amounted to a substantive due process violation. See, e.g., Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168 (3d Cir. 2001) (assistant principal shoved student); Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204 (3d Cir. 2001) (employee required to replace switch on high voltage power line); Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir. 1999) (children removed from mother's custody in ex parte hearing). See also Hawkins v. Freedman, 195 F.3d 732, 738 (4th Cir. 1999) (applying the "shocks the conscience" standard in a parole revocation setting and concluding that there was not a substantive due process violation). We need not definitely determine in this matter the precise standard which is needed to prove a substantive due process violation by state officials engaged in a non-physical confrontation. This is because any such standard would require the finding of a level of intent that we find is significantly absent in this case.

16

terms, violated his parole by possessing marijuana, and failed to steer clear of trouble, as reflected in his phone calls to DeFabio and his ongoing use of marijuana.

Although Hunterson does not rely on the length of the FET alone, he essentially argues that the extent of the departure from the presumptive term was so great that we must infer that the Parole Board was motivated by animus rather than the nature of his previous crime and his behavior while on parole. The District Court's opinion

seems to adopt this same approach. However, a feeling that the FET was too long and was not fair does not amount to a substantive due process violation. We are concerned that, as we noted above, neither Hunterson nor the District Court points to specific record facts of bias or Parole Board misconduct; instead, both rely on timing, speculative theories, and inferences they have drawn from a variety of facts that could just as easily be dismissed as innocent. For example: there are no facts that would render the alleged "suspicious timing" illicit rather than coincidental; the questions posed by a panel of the Parole Board about Ms. Hansen seemed to be a legitimate line of inquiry into the stability of a parole applicant's home life; and the parole officer's belief that Hunterson's ongoing use of marijuana was acceptable does not necessarily make it so.

Hunterson relies to a great extent on the fact that the Parole Board was chastised repeatedly by the New Jersey courts for errors in its proceedings. In response to this, however, we note that while Hunterson was vindicated repeatedly, obtaining relief several times on direct appeal in the New Jersey state courts, the very same court that recognized the errors in the earlier proceedings later rejected Hunterson's claims that the FET was imposed in violation of his rights.

The proper question that must be asked and answered by the District Court is whether the New Jersey court's adjudication involved an unreasonable application of Supreme Court precedent. The substantive component of due process recognized by the Fifth Amendment and made applicable to the states by the Fourteenth Amendment could, indeed, be implicated in a case such as this. In Foucha v. Louisiana, 504 U.S. 71 (1992), the Supreme

17

Court reiterated: "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." Id. at 80 (internal quotation omitted). However, the Court has made equally clear that when an executive action is at issue, only the most egregious conduct will be considered arbitrary in the constitutional sense. In County of Sacramento , the Court said that "conduct intended to injure in some way unjustifiable by any government interest is the sort of action most likely to rise to the conscience-shocking level." Id. at 848.

Thus, the "arbitrary and capricious" standard employed here by the District Court does not comport with Supreme Court precedent which, under AEDPA, provides our analytic compass. We submit that the imposition of the five-year FET alone is not egregious enough to shock the conscience or constitute arbitrariness bordering on deliberate indifference to Hunterson's rights. The issue, then, is whether the record before the District Court when it granted the petition was sufficient to establish, first, the

ulterior improper motives that Hunterson alleges, and then, that the Appellate Division's failure to find the Parole Board's actions sufficiently arbitrary in a constitutional sense constituted an unreasonable application of United States Supreme Court precedent. We are compelled to conclude that neither the record, nor the state court's ruling, can serve Hunterson's purpose. We note that the District Court stated that Hunterson had submitted "volumes" of exhibits. Hunterson I, 137 F. Supp. 2d at 532 n.2. Yet, neither the District Court nor Hunterson has referenced specific evidence that establishes animus or bias connected to the Parole Board hearing whereby the proceeding could be said to shock the conscience. Nor can we find in the record an appropriate factual basis for the District Court's conclusion. A string of facts with inferences that might be drawn from existing facts does not suffice on habeas review under AEDPA.

The District Court's analysis also seemed to rely on inaccurate characterizations of certain aspects of the New Jersey State proceedings. The Board did not, as the District

18

Court suggests, claim that marijuana causes violent behavior, but instead expressed the Board's arguably valid concern that Hunterson was returning to his previous law-breaking lifestyle. The Court characterized the Board's decisions: "[T]he premise of both the Board's decision and the appellate court's affirmance is that Petitioner's possession of marijuana evidenced a return to his law-breaking days because he previously committed murder for which he was incarcerated while under the influence of alcohol and marijuana." Id. at 545-46. In actuality, the Board specifically referenced the crime for which he was sentenced to two life terms, his prior convictions, his history of substance abuse, his arrest for drug possession, the threatening phone calls to Ralph DeFabio, and his presence at a fundraiser for a motorcycle gang member.

Nor did the District Court examine the directives of Supreme Court precedent or measure the state court proceedings against specific principles developed in the case law. Instead, it measured the Parole Board's actions against a standard of reasonableness.

While it is clear that the District Court believed the five-year FET was not called for in light of the facts of this case, that is beyond the proper scope of federal court review. When considering a writ of habeas corpus, it is only for the District Court to consider whether clearly established Supreme Court precedent was applied unreasonably . We conclude that the determination of the New Jersey Supreme Court did not involve an unreasonable application of Supreme Court precedent, given the facts before it.

2. Unreasonable Determination of the Facts

During oral argument and in his brief, Hunterson

devoted considerable attention to the argument that the Appellate Division unreasonably determined the facts. In Hunterson II, the District Court said that the Appellate Division made an "unreasonable interpretation of the facts." 140 F. Supp. 2d at 375. However, as the Court correctly states later in its opinion,[11] the proper standard is the state

---

11. In Hunterson II, the Court claimed that in its earlier opinion it "concluded that petitioner's substantive due process rights were violated because the Board's decision was arbitrary and capricious and not a reasonable determination of the evidence presented at the revocation hearing." Id. at 378.

19

court's determination, not interpretation, of the facts, see id. at 378, and this distinction is telling here, as Hunterson seems to be challenging the state court's view or interpretation of facts, and not its determination.[12] As with the application of the law standard, the District Court needs to consider whether the Appellate Division unreasonably determined the facts, not whether it would have necessarily reached the same conclusion or characterized the facts the same way.

The Appellate Division presented the following summaries of the facts in this case:

> - "[T]he bulk of the evidence including testimony as to Hunterson's arrest on the drug charge; his admission to his parole officer of his return to drug use; his admission to Trooper Pender that he was heading to a motorcycle rally to support 'Egyptian' whose parole had been violated; and the tape of his threats to DiFabio, along with evidence surrounding his original conviction and his prior record . . . ."

> - After his release on parole "he returned to his errant ways through continued drug abuse; association with motorcycle gang members; and threats, ten years after the fact, against a person he apparently believed was responsible for connecting him to the original murder."

> - "[I]mmediately upon parole, Hunterson fell back into the type of conduct which led to his initial convictions for serious crime."

Hunterson's brief, however, does not challenge these

---

12. Appellee argues that the use of "interpretation" instead of "determination" is a "distinction without a difference." However, we must disagree, as the two words have distinct meanings and therefore would provide different standards. To interpret means "1. To explain to oneself the meaning of[;] [or] 2. To expound the significance of." Webster's II New Riverside University Dictionary 638 (1988). To determine, on the other hand, is defined as: "1.a. to arrive or settle . . . authoritatively or

conclusively[;] 1.b. To end or decide by final, esp. judicial action[;] [or] 2. To establish or ascertain definitely, as after consideration, investigation, or calculation." Id. at 369.

"determinations" by the Appellate Division, but instead challenges the manner in which the Parole Board describes or characterizes the facts in its federal appellate brief. It could be said that the Parole Board's brief sets forth the facts in a manner that makes the case against Mr. Hunterson stronger, but that is certainly not surprising or unusual, given its vantage point. But, we are reviewing the state court's determination of the facts. While Hunterson admits his marijuana use, he challenges the characterizations of the other "facts." He claims that attending the rally for Egyptian was not "associating with motorcycle gang members," and contends that his heated exchange with Mr. DeFabio was just "tough talk" and not a threat. Hunterson, however, is challenging the court's view of the gravity of what he did, not its determination of what occurred. It is not the role of the federal court in habeas review to second-guess how the state courts viewed the record facts, but, rather, it can only grant relief if the state court's determination of the facts -- presumably given disputed or incomplete facts -- was unreasonable.

Additionally, Hunterson's argument consists more of an attack on certain conclusions that flowed from basic facts, i.e. that these facts showed that Hunterson had not altered his behavior or adjusted to his parole and was a danger to society. But whether he posed a danger is still a factual, rather than a legal, determination. It is a factual assessment drawn from basic facts. And, under AEDPA, as noted above, such factual determinations made by the state authorities are presumed correct.

The District Court clearly drew inferences from the facts that the Appellate Division did not. However, if permissible inferences could be drawn either way, the state court decision must stand, as its determination of the facts would not be unreasonable. And we so conclude.

The issue which formed the basis of the District Court's ruling was but one of several constitutional challenges raised by Hunterson. Based on the perceived violation of substantive due process, the District Court not only nullified the imposition of the five-year FET, but also released Hunterson. Our reversal of the District Court impacts the ruling and result, as we conclude that

Hunterson's release was not warranted on substantive due process grounds. While the issue of the five-year FET alone has been rendered moot by the passage of time, the issue of Hunterson's release has not. Our ruling means that the revocation of Hunterson's parole will be reinstated, and he

should again be placed in custody pending the outcome of further proceedings. We do not decide whether the remaining constitutional challenges might be such as to require release. Nor do we address the impact of further proceedings assured by the state regarding the eight-year FET imposed after the District Court's rulings, as we referenced at footnote 5 above, or the impact of later events.13 In light of the foregoing, we will REVERSE and REMAND to the District Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

13. We note that, recently, the State of New Jersey submitted a letter to the panel regarding recent events involving appellee. This letter was not a part of the record before the District Court, and, therefore, is not a part of the record before us. We have not given it any consideration.

22